STATE BAR OF MICHIGAN v CRAMER

Docket No. 56413. Argued November 6, 1975 (Calendar No. 11).—
Decided December 30, 1976.

The State Bar of Michigan filed a complaint against Harold
Graham, Michael Gordon and Virginia Cramer alleging that
the defendants were engaged in the unauthorized practice of
law by their "Do-It-Yourself Divorce Plan" kit. The defendants
allegedly advertised that persons who used the divorce kit
could obtain a divorce, prepared pleadings for filing with
courts, gave and sold legal advice, and advised customers on
filling out pleadings and court procedure. The Wayne Circuit
Court, John D. O'Hair, J., entered a judgment permanently
enjoining the defendants from certain activities pertaining to
advising persons about divorce. Defendant Cramer was subse-
quently adjudged guilty of contempt for violation of the injunc-
tion on several occasions. The Court of Appeals, Bashara, P. J.,
and Danhof and Churchill, JJ., affirmed (Docket No. 19075).
The defendant appeals. *Held:*

1. All orders and judgments of courts must be complied with
promptly. Persons who make private determinations of the law
and refuse to obey an order generally risk criminal contempt
even if the order is ultimately ruled incorrect. Violation of an
invalid court order may nonetheless be treated as contempt,
except where the court lacks jurisdiction to issue the order or,
perhaps, where the defendant has no opportunity to contest the
validity of the order.

2. The difference between civil and criminal contempt is that
the former seeks to change the respondent's conduct by threat-
ening him with a penalty if he does not change it, while the
latter seeks to punish him for past misdoings which affront the
dignity of the court; criminal contempt being for past miscon-

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 17 Am Jur 2d, Contempt § 34.
[3] 17 Am Jur 2d, Contempt §§ 42, 47.
[4] 17 Am Jur 2d, Contempt §§ 4, 5.
[5] 17 Am Jur 2d, Contempt § 5.
[6–19] 7 Am Jur 2d, Attorneys at Law §§ 73–90.
What amounts to practice of law. 151 ALR 781.

duct, there is no way for one so convicted to purge himself of the contempt.

3. There is no doubt that the defendant was found guilty of civil contempt April 23, 1973 when the circuit court told her that she would be jailed until she purged herself, and released her the following day after she promised to obey the order. That finding is, therefore, affirmed. The other convictions, however, despite the characterizations by the trial judge, were of criminal contempt; the jail sentences and fines were to punish the defendant for past conduct. Because the proceedings were conducted as civil proceedings but led to punishment for criminal contempt, the convictions are reversed.

4. Any attempt to formulate a lasting, all-encompassing definition of practice of law is doomed to failure for the reason that under our system of jurisprudence such practice must necessarily change with the everchanging business and social order. No essential definition of the practice of law has been articulated and the descriptive definitions which have been agreed upon from time to time have only permitted disposition of specific questions. Laymen are excluded from "law practice" solely to protect the public. This purpose of public protection must dictate the construction put on the term "unauthorized practice of law". The power of the state to regulate the practice of law, however, cannot be exercised so as to abrogate rights of individuals secured by the Constitution.

5. The advertisement and distribution to the general public of forms and documents used to obtain a divorce together with any related textual instructions does not constitute the practice of law. But the defendant goes well beyond merely making available those materials necessary to effect a divorce. She advertises "professional guidance" to her "clients". A personal conference is arranged between the defendant and her client to discuss the divorce. The defendant prepares the documents incident to the divorce proceedings, occasionally files the completed forms in court, and personally advises clients as to the proper testimony.

6. To the extent that the defendant provides personal advice peculiar to the dissolution of a specific marriage, she is engaged in the "unauthorized practice of law".

Affirmed in part, reversed in part.

Justice Williams concurred with the per curiam opinion and agreed with the necessity for skilled professional assistance in legal matters, but wrote further that this case is only a symptom of the problem created by the failure of the legal profession to see that sufficient legal services are reasonably available

and within the means of all people. The very rich and the very poor have access to lawyers, but it is generally admitted that middle-income groups do not have adequate legal services. Protection of the public will be achieved only by action to make skilled professional services available to those who have reasonable need of them. Justice Levin joined Justice Williams as to his remarks concerning the availability of legal services.

Chief Justice Kavanagh, with Justice Levin concurring, concurred in vacating the defendant's convictions of criminal contempt and affirming the judgment of civil contempt. He also agreed that the defendant is not engaged in the unauthorized practice of law when selling legal forms or "divorce kits". He did not, however, agree that the defendant should be prohibited from assisting individuals in the preparation of these forms or rendering other advice peculiar to the dissolution of a specific marriage, because the prohibition is counterproductive. Her customers will go to court less prepared than they are at present. Many people who seek divorces cannot afford, or think they cannot afford, a lawyer, are not eligible, or cannot wait, for legal aid services. The defendant provides an alternative for them, that of processing their own divorces.

Justice Levin also wrote separately to emphasize that:

1. Preparation and filing of standardized papers to obtain an uncontested no-fault divorce where there are no issues of child custody, child support, alimony or property settlement does not require the professional judgment of a lawyer, and therefore does not constitute the practice of law.

2. While it is unclear where the line should be drawn between those cases where a lay advocate may readily assist persons who wish to exercise their constitutional right of self-representation and cases where the client should be encouraged to obtain the services of a lawyer, it has not been demonstrated that once the relevant criteria are determined and the standard established, case-by-case application requires oversight by a member of the legal profession.

3. The organized bar, which has not made available the minimal counseling which would enable a person to exercise his right of self-representation, cannot be heard to say that this service which it does not provide is the practice of law.

4. The Legislature should address the issue of securing to the people their constitutional right of self-representation as part of the larger problem of providing legal services for persons of moderate circumstances.

56 Mich App 176; 223 NW2d 713 (1974) affirmed in part, reversed in part.

OPINION OF THE COURT

1. CONTEMPT—COURTS.

All orders and judgments of courts must be complied with promptly; persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.

2. CONTEMPT—COURTS.

The orderly and expeditious administration of justice by the courts requires that an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.

3. CONTEMPT—COURTS—INVALID ORDER.

Violation of an invalid court order may nonetheless be treated as contempt, except where the court lacks jurisdiction to issue the order or, perhaps, where the defendant has no opportunity to contest the validity of the order.

4. CONTEMPT—CIVIL CONTEMPT—CRIMINAL CONTEMPT.

The difference between civil and criminal contempt is that the former seeks to change the respondent's conduct by threatening him with a penalty if he does not change it, while the latter seeks to punish him for past misdoings which affront the dignity of the court; criminal contempt being for past misconduct, there is no way for one so convicted to purge himself of the contempt.

5. CONTEMPT—CIVIL CONTEMPT.

A defendant was found to be guilty of civil contempt for disobeying an injunction where the trial court told the defendant she would be jailed until she purged herself, and released her the following day after she promised to obey the order; the defendant carried the keys of the prison in her own pocket, and the action is essentially civil.

6. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE.

Laymen are excluded from "law practice" solely to protect the public; this purpose of public protection must dictate the construction put on the term "unauthorized practice of law" (MCL 600.916; MSA 27A.916).

7. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—CONSTITUTIONAL LAW.

The power of the state to regulate the practice of law cannot be

exercised so as to abrogate rights of individuals secured by the Constitution.

8. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—DIVORCE—AD-
   VERTISEMENT.

   The advertisement and distribution to the general public of forms and documents used to obtain a divorce together with any related textual instructions does not constitute the practice of law (MCL 600.916; MSA 27A.916).

9. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—DIVORCE—PRO-
   FESSIONAL GUIDANCE.

   A defendant who advertises "professional guidance" to "clients" in obtaining a divorce; arranges a personal conference with the client to discuss the divorce; prepares the complaint, summons, and all documents incident to the divorce; occasionally files the completed forms with the court; and personally advises clients as to the proper testimony is engaged in the practice of law (MCL 600.916; MSA 27A.916).

10. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—PROFESSIONAL
    GUIDANCE.

    The public has a right to be assured that the interests involved in divorce matters, such as child custody, contract and property rights, inheritance, separate property, and support, are properly represented by members of the State Bar; to the extent that a non-lawyer defendant provides personal advice peculiar to the dissolution of a specific marriage, she is engaged in the unauthorized practice of law (MCL 600.916; MSA 27A.916).

CONCURRING OPINION

WILLIAMS and LEVIN, JJ.

11. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—AVAILABILITY
    OF LEGAL SERVICES.

    *The failure of the legal profession to see that sufficient skilled legal services are reasonably available and within the means of all people creates a vacuum which will be filled by persons engaged in the unauthorized practice of law.*

12. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—AVAILABILITY
    OF LEGAL SERVICES.

    *It is said that the very rich and the very poor have access to lawyers, but it is generally admitted that middle-income groups*

*do not have adequate legal services; protection of the public from the unprofessional practice of law will not be achieved by court orders or prison cells, but by prompt, positive, vigorous and imaginative action to make skilled professional services available to those who have reasonable need of them.*

CONCURRING IN PART AND DISSENTING IN PART

KAVANAGH, C. J., and LEVIN, J.

13. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—DIVORCE—
PREPARATION OF FORMS.

*A defendant who provided legal forms and advice on their preparation to persons seeking an uncontested, "no-fault" divorce was not engaged in the unauthorized practice of law (MCL 552.6, 600.916; MSA 25.86, 27A.916).*

14. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—DIVORCE.

*Prohibiting a defendant from assisting individuals in the preparation of legal forms or rendering other advice peculiar to the dissolution of a specific marriage in an uncontested, "no-fault" divorce proceeding as the unauthorized practice of law is unsound and counterproductive (MCL 552.6, 600.916; MSA 25.86; 27A.916).*

SEPARATE OPINION

LEVIN, J.

15. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—DIVORCE.

*Preparation and filing of standardized papers to obtain an uncontested, "no-fault" divorce where there are no issues of child custody, child support, alimony or property settlement does not require the professional judgment of a lawyer, and therefore does not constitute the practice of law.*

16. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—SELF-REPRE-
SENTATION—PROFESSIONAL GUIDANCE.

*While it is unclear where the line should be drawn between those cases where a lay advocate may readily assist persons who wish to exercise their constitutional right of self-representation and cases where the client should be encouraged to obtain the services of a lawyer, it has not been demonstrated that once the relevant criteria are determined and the standard established, case-by-case application requires oversight by a member of the legal profession.*

17. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—SELF-REPRE-
    SENTATION—PROFESSIONAL GUIDANCE—AVAILABILITY OF LEGAL
    SERVICES.

   *The organized bar, which has not made available the counseling
   which would enable a person to exercise his right of self-repre-
   sentation, cannot be heard to say that this service which it does
   not provide is the practice of law.*

18. ATTORNEY AND CLIENT—SELF-REPRESENTATION—AVAILABILITY OF
    LEGAL SERVICES.

   *The Legislature should address the issue of securing to the people
   their constitutional right of self-representation as part of the
   larger problem of providing legal services for persons of moder-
   ate circumstances.*

19. ATTORNEY AND CLIENT—UNAUTHORIZED PRACTICE—PROFESSIONAL
    GUIDANCE.

   *The practice of law, functionally, relates to the rendition of
   services for others that call for the professional judgment of a
   lawyer; the essence of the professional judgment of a lawyer is
   his educated ability to relate the general body and philosophy
   of law to a specific legal problem of a client.*

*W. Gerald Warren* for plaintiff.

Virginia Cramer *in propria persona.*

Amici Curiae:

*William T. Kerr* for Michigan Clinical Law Pro-
gram.

*Robert L. Reed, Alan W. Houseman* and *William
Burnham* for Michigan Legal Services.

PER CURIAM. The history of this case is convo-
luted and confusing. The business of defendant
Cramer which is the source of this controversy is
described by Judge O'Hair in his findings following
a hearing on December 18, 1972.

"In May, 1972, defendants Graham and Gordon

formed a partnership to conduct a business that consisted of the sale of so-called 'divorce kits.' Later in August they expanded their firm to include the defendant Cramer as a partner. Their business is known as Gordon-Graham & Cramer Associates, and its offices are located at 15800 W. McNichols, Detroit, Michigan.

"Defendants, who admittedly are not attorneys, have solicited over 400 customers or clients by advertising 'DIVORCE' in daily newspapers having a general circulation throughout the State of Michigan. A 'Do-It-Yourself Divorce Plan,' as defendants characterize it, is made available to members of the public for a fee of $75 or $100, plus $30 to $50 costs.

"When a person is interested in purchasing defendants' 'Do-It-Yourseif Divorce Plan,' he has a conference at the defendants' place of business. At the conference the client is advised that defendants are not lawyers, but that they do provide the forms and service which enables one to obtain his own legal divorce. A 'Questionnaire-Agreement' is completed before the termination of the conference.

"From the information set forth in the client's completed questionnaire, the complaint and summons are prepared by the defendants. Thereafter, all documents incident to the divorce proceedings are prepared for the client's or the court's signature. The completed documents are filed with the court and served upon the adverse party, if necessary, by the defendants or by the clients pursuant to the defendants' instructions. Clients are not given a so-called kit of divorce forms, but each form is completed and executed at defendants' office as needed at each appropriate step of the divorce proceedings.

"Before the evidentiary hearing for the entry of judgment, the defendants provide their clients with a statement setting forth suggested testimony to be offered by the client to the court and a list of suggested questions to be asked by the client of a corroborating witness.

"At all stages of the divorce proceedings the defendants, expressly or inferentially, advise the clients as to the legal procedures involved, provide all legal forms incident to the divorce proceedings, provide the service

to complete the aforesaid forms and provide optional assistance in filing and serving all documents.

"Defendants state that at present they are primarily interested in making their 'Do-It-Yourself Divorce Plan' available to persons who anticipate divorce proceedings that are uncontested and do not involve questions relative to children, alimony or marital property. In the past they have not been so selective." (Footnotes omitted.)

The State Bar of Michigan, alleging that it constituted the unauthorized practice of law, sought to enjoin defendant from engaging in this business. On January 5, 1973 Judge O'Hair of the Wayne Circuit Court entered an order permanently enjoining the defendants from:

"(1) Holding themselves out to the public as qualified to render advice and service to persons interested in obtaining a divorce in the courts of Michigan;

"(2) Rendering counsel and service to persons seeking to dissolve a marital relationship by obtaining a judgment of divorce in the courts of the State of Michigan; and,

"(3) Furnishing or offering to furnish kits, forms or documents with assistance in their completion or execution, to persons seeking to dissolve a marital relationship by obtaining a judgment of divorce in the courts of the State of Michigan."

The defendant continued in the business despite several orders finding her in contempt. We finally agreed to consider the matter and at oral argument the defendant frankly admitted she intended to keep on with it.

I

May defendant constitutionally be enjoined from providing divorce forms, assisting in the comple-

tion of these forms, and counseling persons seeking a no-fault divorce in Michigan on the grounds that she was engaged in the unauthorized practice of law, contrary to MCLA 600.916; MSA 27A.916?

Plaintiff asserts that whether or not defendant was engaged in the unauthorized practice of law, she is guilty of contempt for violating the injunction of the Wayne Circuit Court. It is a general rule that

"all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but absent a stay, to comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect. *Howat v Kansas,* 258 US 181, 189–190 [42 S Ct 277; 66 L Ed 550] (1922); *Worden v Searls,* 121 US 14 [7 S Ct 814; 30 L Ed 853] (1887). The orderly and expeditious administration of justice by the courts requires that 'an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.' *United States v [United] Mine Workers,* 330 US 258, 293 [67 S Ct 677; 91 L Ed 884] (1947)." *Maness v Meyers,* 419 US 449, 458–459; 95 S Ct 584; 42 L Ed 2d 574 (1975).

"[I]n one important respect the violation of a court order generally is treated differently from the violation of a criminal statute: If the statute is invalid, the invalidity will require the defendant's acquittal. If a court order is invalid, its violation may nonetheless be treated as contempt, except where the court lacks jurisdiction to issue the order or, perhaps, where the defendant has no opportunity to contest the validity of the order." Kuhns, *Limiting the Criminal Contempt Power: New Roles For the Prosecutor and the Grand Jury,* 73 Mich L Rev 484, 504 (1975).

The reasons for this principle were set forth by

the United States Supreme Court in *Walker v City of Birmingham,* 388 US 307, 320–321; 87 S Ct 1824; 18 L Ed 2d 1210 (1967), upholding convictions for criminal contempt of civil rights marchers who were in violation of an injunction: "[I]n the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives * * * . [R]espect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom."

In the judgment and injunctive order of January 5, 1973, defendant was enjoined from engaging in the unauthorized practice of law, and specific instances of prohibited conduct were listed.

There is no doubt that defendant continued to violate the January 5 order, and, indeed is still doing so. Judge O'Hair adjudged defendant "guilty of civil contempt" on April 23, 1973, and ordered her jailed until she purged herself "by demonstrating that she will discharge her statutory and judicially imposed duty to cease permanently from engaging in the conduct proscribed by the court's judgment and injunctive order of January 5, 1973".

Defendant was jailed April 30, 1973, and on May 1, 1973 appeared before Judge O'Hair and made certain representations to purge herself of contempt, and was released.

On August 6, 1973, Judge O'Hair found that defendant "has violated her purgation of contempt and has broken her promise given in connection with said purgation of contempt to this Court on May 1, 1973 wherein she promised to abstain from the proscribed activities", and again adjudged her in contempt and sentenced her to five days in jail and assessed a fine and costs.

On December 19, 1973, Judge O'Hair again adjudged defendant guilty of contempt and sentenced her to five days in jail.

On October 15, 1974, Judge O'Hair found: "Defendant's * * * conduct from February 14, 1974 through June 27, 1974, has been in violation of the court's judgment and injunctive order of January 5, 1973. The contemptuous conduct has been willful, flagrant, and in absolute defiance of the Wayne County Circuit Court." Defendant was adjudged "guilty of civil contempt * * * as a result of her willful conduct * * * [and] as punishment * * * is to be sentenced to the Wayne County Jail for a period of 30 days, and, in addition thereto, is fined $250."

There is disagreement over the nature of these contempt proceedings, *i.e.,* whether defendant was found guilty of civil or criminal contempt.

"Essentially, the difference between civil and criminal contempt is that the former seeks to change respondent's conduct by threatening him with a penalty if he does not change it, while the latter seeks to punish him for past misdoings which affront the dignity of the court. Criminal contempt being for past misconduct, there is no way for one so convicted to purge himself of the contempt." *Jaikins v Jaikins,* 12 Mich App 115, 120; 162 NW2d 325 (1968).

There is no doubt that the April 23, 1973 finding was that defendant was guilty of civil contempt. Judge O'Hair specifically told the defendant that she would be jailed until she purged herself. She therefore was able to "carry the 'keys of [the] prison in [her] own pocket' [and] the action is essentially civil". *People v Goodman,* 17 Mich App 175, 177; 169 NW2d 120 (1969). In fact, the following day Judge O'Hair released her after she prom-

ised to obey his order. We affirm that finding. The other convictions however, on December 19, 1973 and October 15, 1974, despite the characterizations by the trial judge, were for *criminal* contempt. The jail sentences and fines were to punish defendant for past conduct.

"If [contempt citation] is to punish the offender for his disobedience or contumacious behavior, then it is criminal contempt. If, however, the purpose is to compel obedience to an order of the court, then it is civil contempt." *Spalter v Wayne Circuit Judge,* 35 Mich App 156, 160–161; 192 NW2d 347 (1971).

As we said in *People v Johns,* 384 Mich 325, 333; 183 NW2d 216 (1971):

"When the hearing was instituted by a show cause order and placed on the civil docket, when the proceedings lacked any semblance of a criminal trial and when the sentence had elements of both civil and criminal contempt the defendant could have reasonably expected that he indeed was being held in civil contempt.

"We therefore hold that under the procedure followed here, the defendant could not have been found guilty of criminal contempt and his sentence for such must be vacated."

Judge O'Hair did not make these sentences "conditional". He did not tell defendant she would be able to purge herself of the contempt as he did during the April 23 proceeding. This sentence was "one of *punishment* for behavior already committed in violation of the decree, and the contempt action, being unconditional as to result, is criminal". *People v Goodman, supra,* at 178.

Accordingly, we hold defendant's criminal contempt convictions and resulting sentences must be vacated.

## II

Does defendant's conduct constitute the unauthorized practice of law?

MCLA 600.916; MSA 27A.916 provides:

"It is unlawful for any person to practice law, or to engage in the law business, or in any manner whatsoever to lead others to believe that he is authorized to practice law or to engage in the law business, or in any manner whatsoever to represent or designate himself as an attorney and counselor, attorney at law, or lawyer, unless the person so doing is regularly licensed and authorized to practice law in this state. Any person who violates the provisions of this section is guilty of contempt of the supreme court and of the circuit court of the county in which the violation occurred, and upon conviction is punishable as provided by law. This section does not apply to a person who is duly licensed and authorized to practice law in another state while temporarily in this state and engaged in a particular matter."

Plaintiff contends that defendant has been in violation of this statute since 1972 as a result of selling legal forms and providing advice and counsel necessary to obtaining a divorce.

Defendant responds that all persons have a constitutional right to represent themselves in Michigan courts, and that all she is doing is assisting them in exercising that right. She also contends that the unauthorized practice statute is unconstitutionally vague, that her actions do not constitute the practice of law and that the statute and injunctive order deprive her of her first amendment rights. Amici Curiae, Michigan Clinical Law Program and Michigan Legal Services, agree with defendant's contentions, and also argue that the statute is overbroad, infringes on the right to privacy, and denies equal protection of the law.

To obtain a perspective on the particular problems presented by this case, it is helpful to recall in outline the historical development of the "practice of law".

"The first lawyers were personal friends of the litigant, brought into court by him so that he might 'take "counsel" with them' before pleading. 1 Pollack & Maitland, History of English Law (2d ed 1909) p 211. Similarly, the first 'attorneys' were personal agents, often lacking any professional training, who were appointed by those litigants who had secured royal permission to carry on their affairs through a representative, rather than personally. *Id.,* at 212–213." *Faretta v California,* 422 US 806, fn 16; 95 S Ct 2525; 45 L Ed 2d 562 (1975).

In England, the "practice of law" began to develop in 1178 when Henry II created a central court and appointed five clerks to serve as justices in litigation. By 1292, Edward I was forced to limit the number of practitioners due to the increasing number of unskilled persons practicing around the king's courts. Thus, the Court of Common Pleas was vested with the power to appoint attorneys and limit the practice of law to such persons.

The bar arose, therefore, from a need to protect the public from unskilled persons practicing law.

Pound traces four stages in the colonial development of the legal profession: (1) the attempt to function without lawyers; (2) the irresponsible filling out of writs by court officials; (3) the era of admitted practitioners in permanent judicial organizations; and (4) the era of trained lawyers and development of the organized bar. R Pound, The Lawyer From Antiquity To Modern Times (West, 1953) pp 135–163.

The development of the organized bar was sporadic until the early 1900's. In 1933 the American Bar Association appointed a Committee on Unauthorized Practice.

"Coexistent with the drive to prohibit unauthorized practice of law, there began a revival of the professional nature of the practice of law. Emphasis was increasingly placed upon the responsibilities of the legal profession to the administration of justice in a spirit of public service with the earning of a livelihood deemed 'incidental.' Justice Cardozo observed: '[One is] received into that ancient fellowship [the bar] for something more than private gain. [The lawyer becomes] an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice.' As the concept of public service returned to the legal profession, the courts resumed the role begun in 1292, assuming the responsibility of determining qualifications and imposing discipline upon those members of the profession who violated this spirit of public service as embodied in the Canons of Ethics. As public service became paramount to the profession, efforts to combat the unauthorized practice of law, both within and without the bar, became imperative. In the words of Samuel Tilden, speaking to a group which that night became the Association of the Bar of New York City in an effort to correct the appalling conditions which prevailed throughout the legal system, '[T]he Bar, if it is to continue to exist—if it would restore itself to the dignity and honor which it once possessed—must be bold in defense, and, if need be, bold in aggression.' In attempting to cope with the continuing problem of the unauthorized practice of law, the bar sought to inform the public of the dangers inherent in condoning such practice and to develop coercive remedies to alleviate the problem." Comment, *Unauthorized Practice of Law —The Full Service Bank That Was: Bank Cashier Enjoined From Preparing Real Estate Mortgages to Secure Bank Loans,* 61 Ky L J 300, 303–304 (1972). (Footnotes omitted.)

Michigan, as all other states, regulates the practice of law by statute.

1915 PA 314, ch I, § 61 did not prohibit the "unauthorized practice of law", but rather prohibited any person not licensed from "represent[ing] himself as an attorney at law * * * ".

1919 PA 314, § 61, amended the prior statute by adding that "[i]t shall be unlawful for any person who is not a regularly licensed attorney and counselor of this State * * * to practice law or to engage in the law business * * * ".

Prior to 1931 PA 51, violation of this statute was a misdemeanor. 1931 PA 51 made violation punishable as contempt of court.

This statutory scheme recognizes this inherent authority of the courts to control participants in the courts of the state. *E.g., Ayres v Hadaway,* 303 Mich 589; 6 NW2d 905 (1942).

The Michigan statute also provides that "[n]o person is authorized to practice law in this state unless he complies with the requirements of the supreme court with regard thereto". MCLA 600.901; MSA 27A.901.

These requirements include educational, character and fitness, and examination components. MCLA 600.934, 600.937, 600.940; MSA 27A.934, 27A.937, 27A.940. Additionally, licensed attorneys are subject to discipline, including loss of license, for unprofessional conduct. MCLA 600.904; MSA 27A.904.

While all those not licensed to practice law are prohibited from doing so, the Legislature has not seen fit to define what constitutes the "practice of law", and, accordingly, "[t]he formidable task of constructing a definition of the practice of law has largely been left to the judiciary". Comment, *Lay*

*Divorce Firms and the Unauthorized Practice of Law,* 6 J L Reform 423, 426 (1973).

We are still of the mind that any attempt to formulate a lasting, all-encompassing definition of "practice of law" is doomed to failure "for the reason that under our system of jurisprudence such practice must necessarily change with the everchanging business and social order". *Grand Rapids Bar Association v Denkema,* 290 Mich 56, 64; 287 NW 377 (1939).

No essential definition of the practice of law has been articulated and the descriptive definitions which have been agreed upon from time to time have only permitted disposition of specific questions. These definitions have been relatively helpful in counseling conduct but have provided no sure guide for the public's protection.

A broad definition of the "practice of law" embraces virtually all commercial areas of human endeavor. This, of course, will not do.

"It cannot be urged, with reason, that a lawyer must preside over every transaction where written legal forms must be selected and used by an agent for one of the parties. Such a restriction would so paralyze business activities that very few transactions could be expeditiously consummated." *State ex rel Indiana State Bar Association v Indiana Real Estate Association,* 244 Ind 214, 221–222; 191 NE2d 711 (1963).

The result of this inability to fashion a definition of "practice of law" to fit every situation "has been a line of decisions consistent only in their inconsistency as the courts have sought to accommodate the need for public protection through restricting the practice of law to members of the bar with the economic and practical realities of modern society". Comment, *Unauthorized Practice of Law—The*

*Full Service Bank That Was: Bank Cashier En-joined From Preparing Real Estate Mortgages to Secure Bank Loans,* 61 Ky L J 300, 311 (1972).

"Laymen are excluded from law practice, whatever law practice may be, solely to protect the public." *Oregon State Bar v Security Escrows, Inc,* 233 Or 80, 87; 377 P2d 334, 338 (1962).

It is this purpose of public protection which must dictate the construction we put on the term "unauthorized practice of law".

There is no doubt that this unauthorized practice statute affects constitutional rights. It certainly affects the first amendment rights of defendant; it affects the right to privacy inherent in the marital relationship. *Roe v Wade,* 410 US 113, 152–153; 93 S Ct 705; 35 L Ed 2d 147 (1973); *Boddie v Connecticut,* 401 US 371; 91 S Ct 780; 28 L Ed 2d 113 (1971). It affects the litigants' right to self-representation. Const 1963, art 1, § 13.

Of course, the fact that the statute affects constitutional rights does not make it invalid. However, where a statute does impinge on constitutional rights, it must be "narrowly drawn to express only the legitimate state interests at stake". *Roe v Wade,* 410 US 113, 155; 93 S Ct 705; 35 L Ed 2d 147 (1973).

"The power of the states to control the practice of law cannot be exercised so as to abrogate federally protected rights." *Johnson v Avery,* 393 US 483, 490, fn 11; 89 S Ct 747; 21 L Ed 2d 718 (1969).

"[I]n regulating the practice of law a state cannot ignore the rights of individuals secured by the constitution." *Brotherhood of Railroad Trainmen v Virginia ex rel Virginia State Bar,* 377 US 1, 6; 84 S Ct 1113; 12 L Ed 2d 89 (1964). With these principles in mind, we must consider the unautho-

rized practice statute in light of the divorce laws of Michigan and defendant's activities.

Effective January 1, 1972, this state adopted a no-fault divorce law. MCLA 552.6; MSA 25.86. We agree with one suggestion that this revision in the divorce law was made in the belief that "when the marriage relationship has terminated, granting of the divorce should flow as an inalienable legal right". Honigman, *What "No-Fault" Means to Divorce,* 51 Mich St B J 16, 17 (1972). Because divorce procedures in Michigan are now limited to pleading on statutory grounds and a response either admitting or denying the assertions, divorce procedures have been simplified considerably. Downs, *Family Law, 1972 Ann Survey of Michigan Law,* 19 Wayne Law Rev 479, 498 (1973). The question becomes whether the apparent relative ease with which a divorce can be obtained should enable persons untrained in the law to purport to provide individualized counsel and professional guidance to one seeking a divorce.

There are no Michigan cases which have addressed this issue. However, we are mindful of the opinion of jurisdictions which have considered questions similar to those now presented which have held such practices to be the unauthorized practice of law. In *The Florida Bar v Stupica,* 300 So 2d 683 (Fla, 1974), the mere furnishing of "divorce kits" to the general public was held to constitute the unauthorized practice of law. Contained in these kits were forms which included petition for dissolution, answer, summons, sworn statement of constructive service, default motions, joint stipulations for motion for final hearing, orders setting final hearing, and final judgment of dissolution of marriage. Accompanying these forms were several pages of explanatory data concerning

the forms as well as specific information and advice regarding the use and application of the forms so as to comply with the laws governing the dissolution of marriage. This information was viewed as providing direct legal advice without benefit of legal training and interpretive statutory annotations which would minimize the possibility that the interests of the person seeking assistance on divorce matters were not properly represented. See, also, *The Florida Bar v American Legal & Business Forms, Inc,* 274 So 2d 225 (Fla, 1973).

Concern for the quality of legal representation available to persons seeking a divorce was also expressed in *Oregon State Bar v Gilchrist,* 272 Or 552, 563; 538 P2d 913 (1975). The Court did not consider the advertisement and sale of do-it-yourself divorce kits containing the necessary forms together with an explanatory manual as constituting the unauthorized practice of law. However, the Court specifically distinguished this course of conduct from personal contact between defendants and their "customers" in the nature of "consultation, explanation, recommendation or advice or other assistance in selecting particular forms, in filling out any part of the form, or suggesting or advising how the forms should be used in solving the particular customer's marital problems". The latter was enjoined because the relationship which developed between the parties was tantamount to that of attorney and client.

We also believe this to be a significant distinction. The advertisement and distribution to the general public of forms and documents utilized to obtain a divorce together with any related textual instructions does not constitute the practice of law. There can be no serious challenge raised to this or any enterprise which is otherwise in compliance

with those regulations applicable to products placed in the stream of commerce. Were defendant to limit her activity to providing forms and instructions regarding divorce, her undertaking would be analogous to that set forth in *New York County Lawyers Ass'n v Dacey,* 21 NY2d 694; 234 NE2d 459 (1967), a case involving the publication and distribution of the book, *How to Avoid Probate.* The Court adopted the dissenting opinion below which stated:

"There [was] no personal contact or relationship with a particular individual. Nor does there exist that relation of confidence and trust so necessary to the status of attorney and client. This is the essential of legal practice—the representation and the advising of a particular person in a particular situation.

\*     \*     \*

"At most the book assumes to offer general advice on common problems, and does not purport to give personal advice on a specific problem peculiar to a designated or readily identified person." 28 App Div 2d 161, 171, 174; 283 NYS2d 984 (1967).

But defendant goes well beyond merely making available those materials necessary to effect a legal divorce. She advertises "professional guidance" to her "clients".[1] A personal conference is arranged between defendant and her client to discuss the divorce. The complaint and summons are prepared by defendant. Once completed, all documents incident to the divorce proceedings are prepared for the client's or the court's signature. Defendant occasionally files the completed forms in court. And, in most cases, she personally advises her clients as to the proper testimony to provide.

---

[1] Though defendant objects to the use of the word "client", the advertisements specifically refer to those persons dealing with her as clients.

The interests involved in divorce matters are considerable. Those persons offering advice on legal matters regarding child custody, contract and property rights, inheritance, separate property, and support, to name the more significant, must possess a measure of competency and judgment to insure proper representation. Because defendant offers counsel in the form of professional guidance to persons seeking to extricate themselves from a legal relationship, the party represented, as well as the public in general, has a right to be assured that these interests are properly represented by members of the bar. To the extent that defendant provides personal advice peculiar to the dissolution of a specific marriage, she is engaged in the "unauthorized practice of law" contrary to MCLA 600.916; MSA 27A.916.

We affirm the finding of civil contempt of April 23, 1973 and reverse the contempt convictions of December 19, 1973 and October 15, 1974. The injunctive order entered January 5, 1973 by the trial court is affirmed.

No costs, a public question.

Coleman, Fitzgerald, and Lindemer, JJ., concurred.

Williams, J. *(to concur)*. While I concur with the Court and agree with the necessity of skilled professional assistance in legal matters, neither the Court nor the Chief Justice has directly adverted to the root problem behind this case.

Virginia Cramer is only a symptom of the problem created by the failure of the legal profession to see that sufficient skilled legal services are reasonably available and within the means of all people. A vacuum has been allowed to exist. If

Virginia Cramer had not sought to fill it, some one like her would have done so.

Recently when the Office of Economic Opportunity made legal services obtainable by many who up until then had not had legal services available to them, divorce work was found to be one of the areas of greatest need. The Legal Aid and Defender Association of Detroit, for example, opens its doors to divorces three times a year for about a day or two, and obtains enough divorce cases in that period of time to supply a caseload of 180–200 per attorney. Before that system was introduced, they used to get 18 new cases a day.

It is said that the very rich and the very poor have access to lawyers, but it is generally admitted that middle-income groups do not have adequate legal services. The American Bar Association and the Michigan State Bar have displayed commendable concern about this problem in the last few years. For example, the Michigan State Bar has given good leadership in developing prepaid legal service programs. However, it cannot yet be said that the legal profession has made more than an acceptable beginning in coming to grips with the legal problems of middle-income groups or in adequately serving the needs of the poor.

With the need for counseling and advice so overwhelming, lawyers are going to have to make greater efforts and exercise more ingenuity in satisfying need, because, for every Virginia Cramer that is brought to book a number more will rise in her place. The courts must continue to use traditional means to protect the public against unprofessional practice of the law. But the fact of the matter is that neither court orders nor prison cells will adequately solve the root problem in this case.

The answer to the problem is boldly proclaimed to all who can read in the Michigan State Bar building in Lansing. There emblazoned is the following:

"No organization of lawyers can long survive which has not for its primary object the protection of the public."

In this matter, protection of the public will not be achieved by more of the same, but prompt, positive, vigorous and imaginative action to make skilled professional services available to those who have reasonable need of them. *Verbum sat sapienti.*

LEVIN, J., concurred, except for the first paragraph, with WILLIAMS, J.

KAVANAGH, C. J. *(concurring in part and dissenting in part).* I concur in the per curiam opinion to the extent that it vacates defendant's convictions for criminal contempt and affirms the judgment of civil contempt. I agree also that defendant is not engaged in the unauthorized practice of law when selling legal forms or "divorce kits". I do not agree with the per curiam opinion, however, to the extent that it prohibits defendant from assisting individuals in the preparation of these forms or rendering other advice peculiar to the dissolution of a specific marriage. That prohibition is unsound and counterproductive. Defendant's customers will go to court less prepared than they are at present.

There are sound policy reasons for allowing defendant to continue her business of assisting those who desire her services in helping them obtain a non-contested, no-fault divorce.

I share the conviction that one of the reasons for

Michigan's enactment of the no-fault divorce statute was the recognition that

"the whole divorce proceeding was not only slow, humiliating and costly, but often ignored the basic issue of whether the marriage had broken down to the point where all hope of reconciliation was gone. In addition to noticing these defects in the old law which could be ameliorated by a no-fault divorce law, proponents of the reform stressed the right of parties to a marriage beyond repair to obtain their freedom as quickly and efficiently as possible." Lee, *Divorce Law Reform In Michigan,* 5 J L Reform 409, 416 (1972).

There is no doubt that the cost of an attorney prevents some people from obtaining a divorce. I am convinced that many people who seek divorces cannot afford, or think they cannot afford, the services of a lawyer. They separate from their spouses without obtaining a divorce and later enter into relationships which cannot be solemnized, frequently with serious economic and other consequences.

It is no answer to this problem to point to the existence of publicly funded legal services programs for those unable to afford a lawyer. Those programs are simply unable to handle the numbers of persons seeking divorces in any reasonable period of time. There are many also who would not qualify for the services of these legal aid agencies, but who still are unable to afford the services of an attorney to obtain a divorce.

"Legal aid services are tremendously overburdened and must turn away thousands of divorce clients each year to meet their professional obligations to the clients they do represent. * * * Furthermore, the existing legal services are reluctant to take divorce cases, reasoning that divorce is not a right but a privilege, and that

other legal problems are more pressing." Note, *Justice For The Poor? A Look At The Right To Counsel For Indigents In Divorce Litigation,* 22 NYLS L Rev 87, 97 (1976).

As the United States Supreme Court observed in *Boddie v Connecticut,* 401 US 371, 376–377; 91 S Ct 780; 28 L Ed 2d 113 (1971):

"[W]e know of no instance where two consenting adults may divorce and mutually liberate themselves from the constraints of legal obligations that go with marriage, and more fundamentally the prohibition against remarriage, without invoking the State's judicial machinery.

\* \* \*

"Resort to judicial process by these plaintiffs is no more voluntary in a realistic sense than that of a defendant called upon to defend his interests in court. For both groups this process is not only the paramount dispute-settlement technique, but, in fact, the only available one."

In many instances, if the choice is between being required to hire an attorney to obtain a divorce in the only possible forum—a court—and not obtaining the divorce at all, the "choice" is illusory. The information provided by defendant enables those persons another choice—that of assistance in processing their own divorces. It is apparent from the number of people utilizing her services that such a need exists.

Persons seeking a divorce who can afford a lawyer will continue to hire one. Lawyers perform important services beyond merely filling out and filing the necessary papers. Lawyers experienced in divorce work develop an expertise regarding property settlements, child custody and alimony

awards; that expertise will continue to be purchased by those who can afford it.

In *Johnson v Avery,* 393 US 483; 89 S Ct 747; 21 L Ed 2d 718 (1969), the United States Supreme Court struck down a regulation forbidding inmates from assisting other inmates in the preparation of writs or other legal matters. The observations of Mr. Justice Douglas, concurring, are apropos of the case at bar:

"There are not enough lawyers to manage or supervise all of these affairs; and much of the basic work done requires no special legal talent. Yet there is a closed-shop philosophy in the legal profession that cuts down drastically active roles for laymen. * * *

"That traditional closed-shop attitude is utterly out of place in the modern world where claims pile high and much of the work of tracing and pursuing them requires the patience and wisdom of a layman rather than the legal skills of a member of the bar.

\* \* \*

"Laymen—in and out of prison—should be allowed to act as 'next friend' to any person in the preparation of any paper or document or claim, so long as he does not hold himself out as practicing law or as being a member of the Bar." 393 US at 491–492, 498.

I would vacate the injunction.

LEVIN, J., concurred with KAVANAGH, C. J.

LEVIN, J. Four categories of service are provided by Virginia Cramer[1] to her clients:[2]

---

[1] When these proceedings were commenced, Cramer was in partnership with other persons. The partnership and the partners were defendants. Cramer alone has persevered with this litigation. In this opinion the activities of the partnership and partners are referred to as activities of "Cramer".

[2] While it is customary to refer to those who engage the services of lawyers as "clients", the term has a wider use.

A. Furnishing legal forms;

B. Preparing the forms, and assisting in filing and serving them;

C. Exercising a judgment whether, because there are issues of child custody, child support, alimony or property settlement, the client should be counseled to seek the assistance of a lawyer; and

D. Counseling the client regarding self-representation in court—what to expect and how to present the necessary proofs.

We all agree that furnishing legal forms ("divorce kits") does not constitute the practice of law. We disagree regarding the other services provided by Cramer.

The Court affirms the permanent injunction, entered by the circuit judge, barring Cramer from providing advice, counseling and services to persons seeking to obtain a divorce.

I have signed the Chief Justice's opinion which expresses our view that providing these services should not be enjoined.

I write separately to emphasize my views that

—preparation and filing of standardized papers to obtain an uncontested no-fault divorce where there are no issues of child custody, child support, alimony or property settlement does not require the professional judgment of a lawyer, and therefore does not constitute the practice of law;[3]

—while it is unclear where the line should be drawn between those cases where a lay advocate may readily assist persons who wish to exercise their constitutional right of self-representation and cases where the client should be encouraged to

---

[3] While Cramer limited her activities as indicated, I do not mean to be understood as qualifying my full concurrence in the Chief Justice's opinion.

obtain the services of a lawyer, it has not been demonstrated that once the relevant criteria are determined and the standard established, case-by-case application requires oversight by a member of the legal profession;

—the organized bar, which has not made available the minimal counseling which would enable a person to exercise his right of self-representation, cannot be heard to say that this service which it does not provide is the practice of law; and

—the Legislature should address the issue of securing to the people their constitutional right of self-representation as part of the larger problem of providing legal services for persons of moderate circumstances.

I

A

Many of the forms provided by Cramer are widely available. The complaint, default, affidavit of default and default judgment of divorce were modeled on the forms printed in Honigman & Hawkins, Michigan Court Rules Annotated, Forms. Other forms provided are available from the clerk of the court or the friend of the court. The entire kit was prepared under the supervision of lawyers.

Legal forms, for a variety of purposes, have for many years been sold or made available without charge by stationers, legal newspapers, abstract and title companies, real estate boards, banks, and insurance companies.

There is far less risk of harm to the public resulting from misuse of a "divorce kit" than from misuse of form deeds of conveyance, land con-

tracts, business or residential property leases, *inter vivos* trusts or wills.

If a complaint for divorce is improperly filed, a judge has an opportunity to notice the defect and it can either be remedied or a new complaint filed. When an error is discovered in other legal forms, indiscriminately available to the public, it is often too late to correct the mistake.

### B

Cramer uses an initial interview form in eliciting the information required to prepare an adequate and factually accurate complaint.[4] She selects the appropriate forms and they are prepared for the client's signature.

At the second interview, a week later, the client signs and verifies the complaint, and is told how to file and serve the papers, and is given an opportunity to have these services performed by Cramer for a nominal fee.[5]

Cramer monitors the court dockets to determine when the papers are filed and, following the expiration of 20 days after service, advises the client to appear for a third interview to sign an affidavit of default.

The task of defining the "practice of law" has been confided to the Court.[6] "[I]t is left to the

---

[4] Names and addresses of parties; duration of residence in the county and Michigan; date, place and solemnizer of marriage; prior name of wife; number, names and birthdates of children; date of separation and reason; list of any jointly held property.

[5] The fee was $10, most of which was used to pay process servers to perform the tasks of filing and serving.

[6] "It is unlawful for any person to practice law, or to engage in the law business, or in any manner whatsoever to lead others to believe that he is authorized to practice law or to engage in the law business, or in any manner whatsoever to represent or designate himself as an attorney and counselor, attorney at law, or lawyer, unless the person so doing is regularly licensed and authorized to practice law in this state." MCLA 600.916; MSA 27A.916.

courts of this State as well as those of most other States, to define the 'practice of law.' " *Ingham County Bar Association v Walter Neller Co,* 342 Mich 214, 221; 69 NW2d 713 (1955).

It has been authoritatively stated that "[f]unctionally, the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client".[7]

Under the former practice, when it was necessary to state grounds for divorce, professional judgment was generally required in the preparation of a complaint for divorce. Under no fault there is only one ground, "breakdown of the marriage relationship to the extent that the objects of matrimony have been destroyed and there remains no reasonable likelihood that the marriage can be preserved". The statute provides that the complaint "shall make no other explanation of the grounds for divorce than by the use of the statutory language".[8]

Acts which once constituted the practice of law now no longer require professional skill or judgment. The "reason" it is "extremely difficult to formulate an accurate definition of the 'practice of law' which might endure" is "that under our system of jurisprudence such practice must necessarily change with the everchanging business and social order". *Grand Rapids Bar Association v Denkema,* 290 Mich 56, 64; 287 NW 377 (1939).

---

[7] ABA Special Committee on Evaluation of Ethical Standards, Code of Professional Responsibility (1969), Ethical Consideration 3–5 accompanying Disciplinary Rule 3-101 (Aiding Unauthorized Practice of Law).

[8] MCLA 552.6; MSA 25.86.

The preface to the revised edition of The Attorney's Desk Book[9] states:

"An attorney can record a deed on behalf of a client, but so can non-legal personnel. The same non-legal personnel can secure from a client routine facts with the assistance of an interview form, thus freeing the attorney for necessary legal work which must be done by him alone and, in addition, with lesser financial burden to the client for services rendered at no financial loss to the attorney."

It is stultifying to suggest that the routine activities of conducting interviews, preparing and filing the stylized complaint and associated documents for a no-fault divorce require the professional judgment of a lawyer, "his educated ability to relate the general body and philosophy of law" to these tasks.

Interviewing, preparing, filing and monitoring are performed in many law offices by "non-legal personnel" without actual supervision by a lawyer.[10] "[W]e cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness and forbidden to know as judges what we see as men." *Ho Ah Kow v Nunan,* 12 F Cas 252, 255 (No 6546) (CCD Cal, 1879).

---

[9] Issued under the auspices of the Professional Economics Committee and the Board of Commissioners of the State Bar of Michigan (Ann Arbor, Mich, Institute of Continuing Legal Education, rev ed 1970).

[10] In *Johnson v Avery,* 393 US 483, 490, fn 11; 89 S Ct 747; 21 L Ed 2d 718 (1969), the United States Supreme Court observed that the preparation of petitions for post-conviction relief "though historically and traditionally one which may benefit from the services of a trained and dedicated lawyer, is a function often, perhaps generally, performed by laymen. Title 28 USC § 2242 apparently contemplates that in many situations petitions for federal habeas corpus relief will be prepared by laymen".

## C

The initial judgment whether the services of a lawyer may be required is generally made by laymen. Implicit in the limitations on solicitation by lawyers,[11] is that a layman, the client, makes a judgment—sometimes after consulting another layman—whether the services of a lawyer may or may *not* be required, before a lawyer has an opportunity to make a judgment.

In the borderline areas between the professions, it is laymen—accountants, real estate brokers, insurance agents, trust officers—who make a judgment, sometimes under agreements worked out by the professional associations,[12] of where the practice of one discipline ends and the practice of law begins and of whether to call in a lawyer.

It is illogical and impractical to require potential clients to eschew lay assistance and to obtain the advice of a lawyer when a question arises whether a lawyer's advice should be sought.

It does not appear that any of Cramer's clients have been misled into believing that she is a lawyer or is providing the services which a lawyer might provide.

The interview form contains, immediately above the client's signature, a warning[13] that Cramer is not holding herself out as "qualified to render

[11] DR 2-103, 2-104.

[12] *See Realtor-Lawyer Principles Adopted,* 39 Unauthorized Practice News 177 (1975); *Guiding Principles Respecting Division of Responsibility Between Lawyers and Banks in Planning and Settling Estates,* 39 Unauthorized Practice News 225 (1975); *District of Columbia Bar and 27 Title Insurance Companies Adopt Statement of Principles,* 39 Unauthorized Practice News 223 (1975).

[13] *"IMPORTANT:* This plan is not intended as holding ourselves out to the public as qualified to render advice and service to persons who are interested in obtaining a divorce in the courts of Michigan. If you need expert counseling, legal advice and service, you should consult a licensed lawyer or an attorney at law.
*"FOR EXAMPLE:*

advice and service" to persons interested in obtaining a divorce and that if "expert counseling, legal advice and service" is needed an attorney at law should be consulted, as where there are issues of child custody, child support, alimony or property settlement.

There is no evidence that Cramer counseled her clients on matters requiring the specialized training and professional judgment of a lawyer. The form judgment of divorce which she used contained a standard provision that no alimony is to be paid. Clients desiring alimony were directed to engage the services of a lawyer.[14] Similarly, if a dispute arose between a client and spouse concerning the disposition of property which they could not resolve themselves, no further assistance would be provided and the client was referred to a lawyer.

In sum, it appears that the papers were prepared on the assumption that there are no unresolved disputes. Where there was a dispute, further services were not provided and the clients were told to obtain the services of a lawyer. Referrals were made to individual lawyers and to the local bar association's lawyer referral service. It was estimated that over 600 cases had been referred to lawyers.

The line drawn by Cramer is clear cut. It does not depend upon analysis of varying facts on a

---

"Child custody
"Visitation
"Child support
"Alimony
"Separate maintenance.
"Real & personal property rights.
"Pension funds and benefits.
"Social Security benefits.
"Insurance coverage and benefits."
[14] In one case alimony was requested in error.

case-by-case basis. If there is an unresolved dispute she will not assist further. The standard she has developed functions much like the standards adopted to resolve borderline disputes between the legal profession and other professions.[15]

Perhaps the services of a lawyer should be required whenever there are minor children or property is to be divided. If the judicial judgment were that the line should be drawn more conservatively than Cramer has drawn it, the Court might more properly so hold, rather than proscribe such services altogether. There are a large number of young persons with limited resources who may wish, upon separation after a marriage of short duration, without children or accumulation of property, to avail themselves of Cramer's services. If no alimony is desired, it is a remote possibility that any professional judgment is required. "Of course, exceptional cases may arise from time to time where legal problems are involved in the presentation of [cases], but it is the ordinary [case] and not the exceptional one which now engages our attention. Anticipating the exceptional would hardly be practicable."[16]

The concern expressed that Cramer will not recognize potential problems which a lawyer might perceive appears, on this record, to be chimerical. One would expect that if any substantial evidence existed that substantive rights of Cramer clients had been lost because of her inability to perceive the need for and advise the employment of legal counsel the State Bar would have offered such

[15] See fn 12, supra, and accompanying text.

[16] Goodman v Beall, 130 Ohio St 427, 431; 200 NE 470, 472 (1936). The court declared that the common practice of laymen assisting an injured or deceased workman or his dependents in the submission of a workmen's compensation claim was not the practice of law but that an appeal after notice of disallowance of claim constituted the practice of law.

evidence. We should not uncritically indulge a hypothesis unsupported by record evidence where there is plentiful experience from which evidence could have been derived.

If the experience subsequent to the making of this record indicates a need for limitations to protect the public they could be imposed upon the requisite showing.

The desire of the State Bar to protect the public and the desire of persons to obtain services enabling them to exercise their right of self-representation can be harmonized. Denying services to persons of moderate circumstances to protect them against imaginary risks cannot be justified where lesser measures will achieve the objective.

## D

Virginia Cramer is not selling a divorce kit, but an idea.

The right of a litigant to represent himself derives from the Constitution: "A suitor in any court of this state has the right to prosecute or defend his suit, either in his own proper person or by an attorney." Const 1963, art 1, § 13. This provision is of long standing.[17]

Most lay persons wisely refrain from exercising this right in ordinary litigation; without the training and skill of a lawyer, few laymen will be able to represent themselves adequately.

If the constitutional right of self-representation

[17] *See* Const 1850, art 6, § 24; Const 1908, art 2, § 12.

The United States Supreme Court has held that the Sixth Amendment, as made applicable to the states by the Fourteenth Amendment, secures to a defendant in a state criminal case a right of self-representation. *Faretta v California,* 422 US 806; 95 S Ct 2525; 45 L Ed 2d 562 (1975). *See People v Anderson,* 398 Mich 361; 247 NW2d 857 (1976).

is to be meaningful, lay persons will generally require guidance and assistance.

Cramer, a week before the scheduled court date, conducts the fourth and final interview. The client is provided a form entitled "My Day in Court", intended to prepare him to give testimony in court. There are blanks for the necessary factual allegations, to be filled in by the client in his own handwriting. The *pro forma* statements—the litany of a *pro confesso* divorce—are set forth. The client receives a proposed judgment of divorce to be handed up to the judge. Additional information is also given regarding the location of the courtroom, courtroom etiquette and attire. This is the final meeting. Cramer does not appear with or represent clients in court. Clients are encouraged to call back if problems arise.

Educating persons in the exercise of their constitutional right of self-representation has not been part of the traditional business of the lawyer. Most lawyers have provided this service to no one.

While the faculties of the law schools are in the main composed of lawyers who at one time were admitted to practice in some jurisdiction, a lawyer may not practice in this state unless he is an active member of the State Bar. It is the apparent opinion of the majority of the faculty of one of this state's better-known law schools that teaching law does not constitute the practice of law—60% of the full-time faculty are not active members of the State Bar.[18]

The United States Supreme Court has observed that "[t]he colonists brought with them an appreciation of the virtues of self-reliance and a tradi-

---

[18] The figure is reduced to 55% non-membership if one counts all, including adjuncts, who are designated assistant professor, associate professor or professor of law.

tional distrust of lawyers. * * * This prejudice gained strength in the Colonies where 'distrust of lawyers became an institution' ". The Court noted that the constitutions of most states confer a right of self-representation. *Faretta v California,* 422 US 806, 826–827, 813; 95 S Ct 2525; 45 L Ed 2d 562 (1975).

It appears, therefore, that the right of self-representation derives in part from distrust of lawyers. It derogates from that right to bar persons who desire to exercise it from obtaining knowledge regarding the manner of exercise except from a lawyer.

Most lawyers have more rewarding work to perform than to make available to the public the service provided by Cramer: confining participation in a divorce case to preparation and offering to file the necessary papers, monitoring dockets and counseling the client regarding self-representation.[19]

---

[19] "Where there has been growing and unmet demand for particular legal services, other means of delivery have been devised in substantial response to the bar's failure to meet those needs through more efficient and less costly delivery systems. As noted by Johnstone and Hopson:

" 'It appears to be axiomatic in the United States that whenever a particular task or combination of tasks performed by lawyers grows to mass volume proportions and the mass demand promises to continue, laymen will eventually take over performance of these tasks unless deterred from doing so by unauthorized practice laws. In part this results from more efficient lay specialization and standardization and more aggressive lay advertising and solicitation. But in part, too, it results from lawyers' reluctance to counter lay competition by cutting fees or increasing quality.'

"Examples where this has taken place include such areas of legal practice as the review of the legal adequacy of mortgages being acquired by large institutional lenders and title insurance by the 'big plant' insurers. Pressures to reduce costs exerted by non-lawyer dominated work units providing legal services have resulted in insurance companies using non-lawyers (insurance adjusters) for most claims settlement work and government using non-lawyer bid and contract reviewers, social security and veteran's benefits claims adjusters, FHA field investigators, regulatory agency violation investigators, etc." Brickman, *Expansion of the Lawyering Process Through a*

Some lawyers who might be willing to provide this service may fear disciplinary proceedings should they do so. Others, aware of the dim view that many judges take of self-representation, will stand aside. Some will be concerned that they may incur the opprobrium of lawyers who regard the rendering of such services as undermining the dignity of the profession. Whatever the reason, the service is not available from members of the organized bar.

The United States Supreme Court has held that "unless and until the State provides some reasonable alternative [e.g., lawyers or law students[20]] to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners". *Johnson v Avery,* 393 US 483, 490; 89 S Ct 747; 21 L Ed 2d 718 (1969).[21]

---

*New Delivery System: The Emergence and State of Legal Paraprofessionalism,* 71 Colum L Rev 1153, 1179–1180 (1971).

[20] "By contrast, in several states, the public defender system supplies trained attorneys, paid from public funds, who are available to consult with prisoners regarding their habeas corpus petitions. At least one State employs senior law students to interview and advise inmates in state prisons. Another State has a voluntary program whereby members of the local bar association make periodic visits to the prison to consult with prisoners concerning their cases. We express no judgment concerning these plans, but their existence indicates that techniques are available to provide alternatives if the State elects to prohibit mutual assistance among inmates." *Johnson v Avery, supra,* pp 489–490.

[21] *Johnson v Avery, supra,* was extended in *Procunier v Martinez,* 416 US 396, 420; 94 S Ct 1800; 40 L Ed 2d 224 (1974), where the Court again held invalid a state requirement barring non-lawyers from providing service where implementation of the restriction would deny access to the courts. The restriction set aside absolutely barred lawyers from using students and legal para-professionals to conduct attorney-client interviews in prisons. The Court held this constituted an unjustified restriction on the prisoner's right of access to the courts since it would "deter some lawyers from representing prisoners who could not afford to pay for their traveling time or that of licensed private investigators".

In *Sperry v Florida ex rel Florida Bar,* 373 US 379; 83 S Ct 1322; 10

At stake in *Johnson* was the fundamental right of a prisoner to have access to the courts for the purpose of presenting his claims for post-conviction relief. Here the right involved is that of persons of moderate circumstances to have access to the courts for the purpose of dissolving a marriage.

The United States Supreme Court has held that the state cannot require an indigent person to pay a filing fee or service of process costs as a precondition to obtaining legal dissolution of a marriage. The Court declared that marriage involves "interests of basic importance in our society" and that at stake was "the adjustment of a fundamental human relationship." The interest was characterized "a protected right". The Court concluded that "given the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving this relationship, due process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages". *Boddie v Connecticut*, 401 US 371, 374, 376, 383, 379; 91 S Ct 780; 28 L Ed 2d 113 (1971).

Justice WILLIAMS' opinion states the practical

L Ed 2d 428 (1963), the Court upheld the power of the United States Patent Office to admit lay practitioners although under state law the prosecution of a patent application for others constituted the practice of law. In *Keller v Wisconsin ex rel State Bar of Wisconsin*, 374 US 102; 83 S Ct 1686; 10 L Ed 2d 1026 (1963), the Court remanded for reconsideration in the light of *Sperry* a decision of the Wisconsin Supreme Court that a lay practitioner before the Interstate Commerce Commission could not appear before the Public Service Commission, although permitted by Wisconsin statutes and the administrative code. *State ex rel State Bar of Wisconsin v Keller*, 16 Wis 2d 377; 114 NW2d 796, 116 NW2d 141 (1962). On remand the Wisconsin court acknowledged that Keller could give in Wisconsin his opinion on ICC matters but held that he could not appear in a representative capacity before the state Public Service Commission. *State ex rel State Bar of Wisconsin v Keller*, 21 Wis 2d 100; 123 NW2d 905 (1963), *cert denied* 377 US 964; 84 S Ct 1643; 12 L Ed 2d 734 (1964).

unavailability of legal services for a large segment of the population. The choice for many persons who do not have $400 or more to hire a lawyer, is to forego, or be unduly delayed in obtaining, a divorce, although the only relationship extant between the couple is the one recognized by law. Paraphrasing *Johnson v Avery, supra,* as long as the state monopolizes the means of dissolving this relationship, and the profession, in the exercise of its monopoly, does not provide services to persons who would exercise their right of access to the courts through self-representation, this Court should not enforce a rule barring laymen from furnishing the assistance which lawyers do not provide.

## II

Legislative consideration of the question would now be warranted.

The purpose of the no-fault divorce law is to provide a quick and efficient remedy.[22] For a poor person or one of moderate circumstances who cannot obtain legal representation, this legislation's promise has not been fulfilled.

The public interest may require supervision of the kind of service provided by Cramer lest the abuses feared by the State Bar become real.[23] Legislation providing for licensing and regulation of lay advocates would facilitate the rendering to

---

[22] Lee, *Divorce Law Reform in Michigan,* 5 J L Reform 409, 416 (1972).

[23] The rapid growth of lay advocacy as a means of providing legal service in situations or to persons not generally served by the profession is described in Brickman, *supra,* 71 Colum L Rev, pp 1189–1210. It appears that this was a prevalent means of representation in the early days of the republic. *Id,* p 1169.

*See* Robinson, *Appearances by Laymen in a Representative Capacity Before Administrative Bodies,* 5 Law and Contemporary Problems 89 (1938).

the public the necessary service and provide a
means of securing protection against abuse.[24]

---

[24] I appreciate that state supreme courts have generally asserted
that the power to determine what constitutes the practice of law
inheres in the judiciary, as stated by the Supreme Court of Okla-
homa, "without regard to whether the acts involved were 'forensic' or
'nonforensic' ". *RJ Edwards, Inc v Hert,* 504 P2d 407, 415 (Okla,
1972). *People ex rel Chicago Bar Ass'n v Goodman,* 366 Ill 346; 8
NE2d 941; 111 ALR 1 (1937), *cert den* 302 US 728; 58 S Ct 49; 82 L Ed
562; *reh den* 302 US 777, 58 S Ct 138; 82 L Ed 601 (1937); *In re
Unauthorized Practice of Law in Cuyahoga County,* 175 Ohio St 149;
23 Ohio Ops 2d 445; 192 NE2d 54; 2 ALR3d 712 (1963). *But see Eagle
Indemnity Co v Industrial Accident Commission,* 217 Cal 244; 18 P2d
341 (1933), holding that it was within the prerogative of the Legisla-
ture to allow laymen to represent injured workers throughout a
workmen's compensation proceeding.

These claims of judicial power are extravagant. The judiciary may
assert but does not legitimately have the inherent, constitutionally
implied power to bar non-lawyers from pursuing their vocations on a
finding of impingement on work sometimes or traditionally done by
lawyers. Occupational licensing of non-lawyers is a legislative prerog-
ative; unless the Legislature were to authorize non-lawyers to appear
in *court,* there is no intrusion on judicial power.

The "judicial power" (Const 1963, art 6, § 1) is vested in the "one
court of justice" *(id);* this Court has "general superintending control
over all *courts"* (Const 1963, art 6, § 4) and the power by general rules
to "establish, modify, amend and simplify the practice and procedures
in all *courts* of this state". (Const 1963, art 6, § 5). (Emphasis added.)

The power conferred manifestly includes the power to decide who
may practice in the courts; legislation concerning the licensing of
persons to practice in the courts is subject ultimately to judicial
control.

As long as the Legislature refrains from defining the term "practice
law", as used in existing legislation, this Court can define it. The
Legislature may, however, amend the statutes and, as Congress and
some states have done, authorize lay advocates to represent clients
before administrative tribunals.

The power conferred in Const 1963, art 6, § 28 to review adminis-
trative action which is "judicial or quasi-judicial" and affects private
rights or licenses is not a source of additional judicial power to
regulate practices and procedures in such tribunals. If it were, then
the business of this Court would include not only overseeing the
practices and procedures of the courts but establishing, by rule and
administrative order, the administrative procedures and supervision
of the countless township, city, county and state administrative
agencies whose actions are subject to judicial review. Plainly that is
beyond our authority and energy.

The Federal Administrative Procedures Act provides that a person
compelled to appear before an agency is entitled to be represented
and advised by counsel "or, if permitted by the agency, by other
qualified representative". 5 USC 555(b). Some of the important Fed-

Some may view state regulation of lay advocacy as legitimizing and encouraging this development; others who favor the expansion of lay services as a means of making legal services available to the poor, may fear that the organized bar will co-opt the regulatory function.[25] Both concerns are justified.

eral agencies permit representation by qualified lay advocates. Immigration and Naturalization Service, 8 CFR 3.1(d)(3); Drug Enforcement Administration, Department of Justice, 21 CFR 1316.50; Federal Energy Administration, 10 CFR 205.3; Federal Power Commission, 18 CFR 1.4; Food and Drug Administration, 21 CFR 2.58, 2.59; National Labor Relations Board, 29 CFR 102.38. *See also* Social Security Administration, 20 CFR 416.1446; Equal Employment Opportunity Commission, 29 CFR 1601.6. The Tax Court of the United States (formerly denominated the Board of Tax Appeals and not an Article III court; see Wright, Federal Courts [2d ed], § 11, p 34) admits nonattorneys who pass an examination given by the court (US Tax Ct R 2).

The Department of Health, Education and Welfare permits welfare clients to be "represented by an authorized representative, such as legal counsel, relative, friend, or other spokesman or he may represent himself". 45 CFR 205.10(a)(3)(iii). In consequence, the regulations of the Michigan Department of Social Services are substantively identical. 1970–1971 AACS, R 400.903(1)(a), p 5643.

The rules of practice and procedure of a number of state agencies permit a person to appear either in person, "by duly authorized agent or by counsel". State Board of Physical Therapy Registration, 1966 AACS, R 338.1122, p 3673; State Board of Nursing, 1968 AACS, R 338.1241, p 4716; Electrical Administrative Board, 1969 AACS, R 338.1082, p 5142; State Board of Veterinary Examiners, 1958 AACS, R 287.1, p 932; Board for Marriage Counselors, 1968 AACS, R 338.1836, p 4726 ("by counsel or otherwise"); Michigan Employment Security Appeal Board, 1967 AACS, R 421.525, 421.532, pp 4358–4359.

[25] "[T]ypically, the lay advocate works for, or in, a nonlawyer-dominated institution, such as a prison, a labor union, or a community organization having only sporadic contact with the lawyer. Despite performing work which clearly constitutes the practice of law, and despite the absence of a lawyer's supervision, the lay advocate has gained a measure of statutory protection and societal acceptance not accorded the lay assistant. The growth of the administrative agency, for one, has supplied great impetus to the development of lay advocacy; concern for accessibility to decision-making processes, especially those adjudicating rights of individuals, prompted lawmakers to provide for lay representation before the administrative agency. States have adopted similar measures in recognition of the fact that access to lawyering is essential for groups requiring legal services which lawyers, due to their inefficient delivery system, cannot provide at a feasible price. These laws are themselves part of a process of ensuring

It would also be in order to consider again whether the workaday business of uncontested divorce should not be transferred from the court to, say, the friend of the court who in practice makes the bulk of the decisions, subject to judicial review and modification. What is now a judicial procedure would then become an administrative procedure with, as now, *de novo* judicial review by a circuit judge only in contested cases where a disagreement concerning the friend of the court's recommendation/decision cannot be resolved to the satisfaction of both parties. The major part of the work involved in processing divorce cases is now being conducted in this manner;[26] what is now

equal protection for widening segments of the population. For example, to provide a working man with both a claim against his employer for injuries sustained on the job and a specialized forum for adjudication of his claim is an exercise in futility unless he is also provided with the needed assistance (advocacy) to invoke the claim process.
* * *

"In summary, both the legal profession in the case of the legal specialist, and society, in the case of the lay advocate, have made a judgment that in some instances the lay practice of law is desirable. Much of the contemporary discussion of the lay practice of law is reflected in an oral debate between representatives of the A.B.A. (the private bar) and O.E.O. Legal Services (the public bar). Symbolizing the dialogue are references to the 'public sector versus the private sector.' Simply put, the private sector, or organized bar, is interested in the lay assistant as a means of increasing the efficiency of legal practice methods and thereby, the income of lawyers. The public sector view focuses on the lack of access of the poor (and even of the middle-class) to legal services and is concerned mainly with delivering those services—a concern for the development of lay advocates which is of secondary importance to the private sector. The dialogue is often heated because the private sector talk of certification of para-legal personnel is perceived by public sector adherents as a means of controlling the development of lay advocates, particularly free-standing lay advocates operating without the supervision or control of an attorney. On the other hand, public sector proponents speak of expanding the legal services delivery mechanism without much regard for private sector-imposed strictures, such as prohibitions against the unauthorized practice of law." Brickman, *supra,* 71 Colum L Rev, pp 1187–1188.

See, also, Statsky, *Paralegal Advocacy Before Administrative Agencies: A Training Format,* 4 Toledo L Rev 439 (1973).

[26] *See* rules of circuit courts—Wayne County, Rule 10 (Domestic

*de facto* would become *de jure* and be extended to the *pro confesso* and all uncontested phases of divorce proceedings.

The *pro confesso* divorce is a misuse of limited judicial time and an embarrassment to the judicial process. The imposition felt by the judiciary is especially galling when untrained persons seeking to represent themselves come into court without adequate preparation.

Jailing Cramer from time to time will not relieve the circuit courts of the obligation imposed by present law to allocate time to perfunctory business nor will it provide the public with the service that the success of her enterprise demonstrates is needed.[27]

---

Relations Actions), reprinted in Michigan Court Rules, 1976 (West Pub Co), which but adumbrates the central role of the friend of the court in the decisional process.

[27] "The effect of court-related expenses, minimum fee schedules, and prohibitions against advertising, solicitation, specialization, unrestricted group legal services and the unauthorized practice of law, is to bar the legally poor from the formal processes of adjudication and rulemaking in our courts and administrative agencies. These bastions of the legal profession's monopoly over the practice of law have been shown to be constitutionally infirm. Unless a new legal services delivery system, which lacks minimum fees and includes advertising, lay performance of simple legal tasks and the variety of efficiency-increasing techniques, is developed by the bar, the price tag on justice will continue to be unconscionable. Even though the equal protection and due process clauses have failed to provide a basis for successfully challenging impediments to access to the courts and to lawyering services, the first amendment may prove to be the functional equivalent of a fourteenth amendment guarantee. The bar's practices which prevent segments of our population from participating in the claim process are in jeopardy and ought to so remain until the high ideals espoused by Henry VII's England become a reality in this nation and 'every pouer persone * * * shall have * * * [access to courts] and also lerned Councell and attorneyes.' " Brickman, *Of Arterial Passageways Through the Legal Process: The Right of Universal Access to Courts and Lawyering Services,* 48 NYU L Rev 595, 668 (1973).