WILLIAMS INTERNATIONAL CORPORATION v SMITH

Docket Nos. 77964, 79153. Submitted November 16, 1984, at Detroit.
—Decided July 15, 1985. Leave to appeal applied for.

Williams International Corporation brought an action in the
Oakland Circuit Court against James Smith and others seeking
a permanent injunction enjoining defendants and all persons
acting in concert with them from trespassing on and obstruct-
ing ingress and egress to its premises. The court granted a
permanent injunction to plaintiff. James Smith and others were
held in contempt for violating the permanent injunction and
ordered confined to the county jail until they promised to obey
the court's order in the future. They appealed. Jeffrey Schoon-
over-Higgins and others were found to be in contempt of court
for violating the permanent injunction and were ordered jailed
until they promised to obey the court's order in the future.
They appealed. The appeals were consolidated by the Court of
Appeals. *Held:*

1. The appellants' contempt was civil contempt and was
punishable without affording the contemnors criminal proce-
dural safeguards.

2. Promised future compliance with prior judicial orders is a
common and appropriate method of purging contempt and does
not violate a contemnor's Fifth Amendment right against self-
incrimination, his First Amendment right to freedom of speech
where the acts prohibited are claimed to be political speech, or
a constitutional right to privacy.

Affirmed.

1. CONTEMPT — WORDS AND PHRASES.
   Contempt of court is a wilful act, omission or statement tending
   to impair the authority or impede the functioning of a court.

2. CONTEMPT — DIRECT CONTEMPT — RULES OF EVIDENCE.
   Contempt is direct if committed in the immediate view and
   presence of a sitting court, *i.e.,* in cases where all facts neces-

REFERENCES FOR POINTS IN HEADNOTES
[1-5] Am Jur 2d, Contempt § 2 *et seq.*
    Attack on judiciary as a whole as indirect contempt. 40 ALR3d
    1204.

sary to a finding of contempt are within the personal knowledge of the judge; direct contempt may be punished summarily and the proceedings are not governed by the Rules of Evidence (MCL 600.1711[1]; MSA 27A.1711[1]; MRE 1101[b][4]).

3. CONTEMPT — INDIRECT CONTEMPT — COURT RULES.

Contempt is indirect when committed beyond the immediate view and presence of the court and cannot be punished summarily but only in accordance with the statute, court rule, and due process (MCL 600.1711[2]; MSA 27A.1711[2]; MCR 3.606; GCR 1963, 760).

4. CONTEMPT — CIVIL CONTEMPT.

Civil contempt differs from criminal contempt in that it seeks to change the respondent's conduct by threatening him with a penalty if he fails to change his behavior, while criminal contempt seeks to punish the respondent for past wrongdoing which affronts the dignity of the court; one convicted of criminal contempt is not able to purge himself.

5. CONTEMPT — CIVIL CONTEMPT — PROMISE OF FUTURE COMPLIANCE — CONSTITUTIONAL LAW.

Promised future compliance with prior judicial orders is a common and appropriate method of purging contempt and does not violate a contemnor's Fifth Amendment right against self-incrimination, his First Amendment right to freedom of speech where the acts prohibited are claimed to be political speech, or a constitutional right to privacy.

*Keywell & Rosenfeld* (by *Dawn L. Phillips* and *Blair B. Hysni),* for plaintiff.

*Kelman, Loria, Downing, Schneider & Simpson* (by *Michael L. Pitt),* and *William H. Goodman,* for defendants.

Before: HOOD, P.J., and BRONSON and R. L. TAHVONEN,* JJ.

R. L. TAHVONEN, J. Appellants in these consolidated cases appeal as of right from two contempt orders entered by Oakland County Circuit Judge

---

* Circuit judge, sitting on the Court of Appeals by assignment.

James S. Thorburn. Appellants[1] were found in contempt for violating a June 29, 1983, permanent injunction enjoining them from trespassing on or obstructing ingress and egress to the Williams International Corporation plant at Walled Lake, Michigan, and for their refusal to promise the court they would refrain from such conduct in the future. We affirm.

Williams operates a manufacturing complex in Walled Lake, Michigan, with a physical plant consisting of 63 acres surrounded by an 8-foot-high fence. Part of the Walled Lake operations involves the manufacture of a gas turbine engine which the United States government uses in the cruise missile. The Walled Lake plant has been the object of demonstrations by appellants and others who protest Williams's participation in the production of nuclear weapons. In May, 1983, certain individuals entered the premises by cutting the perimeter fence and spread ashes on the grounds and defaced the walls of buildings. Williams filed a complaint in the circuit court which resulted in a default judgment and a permanent injunction enjoining several individuals, including defendants-appellants Margaret Dewey and Peter Dougherty, and all persons acting in concert with them, from trespassing on and obstructing ingress and egress to Williams's premises at Walled Lake.

Several persons disobeyed the injunction and numerous contempt orders were issued following incidents at the plant in August and November,

---

[1] Of the appellants in these consolidated appeals, only Peter Dougherty, James Smith and Margaret Dewey were named defendants in the June 29, 1983, injunctive order. The remaining appellants, although not named defendants, were found in contempt for violation of the injunction because they were within the class of persons subject to the injunction. For ease of reference, we will use the term "appellants" to refer to all appellants in both files, regardless of whether they are named defendants.

1983. Those orders have resulted in two previous appeals, Docket Nos. 73394 and 73401.

The present appeals involve contempt orders entered on April 20, 1984 (Docket No. 77964), and June 11, 1984 (Docket No. 79153). The trial court found in both cases that appellants had knowledge of the June 29, 1983, injunction and violated its terms by either trespassing or blocking ingress and egress to the Walled Lake plant. In Docket No. 77964, the appellants[2] were found in contempt for "refusing to agree to refrain from violating" the permanent injunction. The order of contempt stated that appellants:

"shall remain committed to the Oakland County Jail, there to remain until they have purged themselves of contempt by agreeing to be bound by the Judgment of Permanent Injunction of this Court entered on June 29, 1983. In the event any one of the aforesaid individuals shall agree to abide by the Judgment of this Court, that person shall be deemed to have purged himself of contempt and that person shall be released. Each of the aforesaid individuals holds the keys to his jail cell."

Appellants filed a claim of appeal on April 30, 1984. On May 10, 1984, this Court entered an order staying the April contempt order, and appellants were released that day.

In Docket No. 79153, appellants[3] were found in contempt and committed to the Oakland County Jail. It was further ordered:

[2] The April, 1984, order found the following individuals in contempt: Daniel LaGrou, Sol Metz, Peter Dougherty, James Smith and Carfon Foltz. All five individuals were committed to jail.

[3] The June, 1984, order found the following persons in contempt: Joel Nigg, Jeffrey Schoonover-Higgins, Margaret Dewey, William Kellerman, Patricia Mentzer, Mary Girrard, Anthony Raffenaud, Carfon Foltz, Ken Grunow, and Sheila Gainey. All were committed to jail except Nigg, who purged himself by certain statements to the court, and Foltz, who was not incarcerated for health reasons.

"each Respondent shall hold the keys to his jail cell, in that he or she shall remain committed to the Oakland County Jail until he or she shall purge himself or herself of contempt by demonstrating that he or she will discharge his or her statutory and judicially imposed duty to cease permanently from engaging in the conduct proscribed by this Court's judgment entered on June 29, 1983 or in the alternative by posting a $2.00 personal recognizance bond with the Court. In the event any one of the aforesaid individuals shall so demonstrate that he or she will discharge that duty or shall post the aforesaid bond, that person shall be deemed to have purged himself or herself of contempt and that person shall be released forthwith."

The appeals were consolidated for hearing and decision by this Court.

I

Appellants first contend that, despite the trial judge's labeling of these proceedings as civil, they were, in fact, criminal in nature and therefore the court's failure to afford appellants criminal procedural protections resulted in a denial of due process requiring reversal. Appellee contends that the orders were for civil contempt, but concedes that, if they were criminal contempt orders, appellants are entitled to reversal because they were not afforded the rights required in criminal proceedings. We find that the orders were for civil contempt.

Contempt of court is a wilful act, omission or statement tending to impair the authority or impede the functioning of a court. *In re Gilliland*, 284 Mich 604; 280 NW 63 (1938), *cert den* 306 US 643; 59 S Ct 583; 83 L Ed 1042 (1939), *reh den* 306 US 669; 59 S Ct 641; 83 L Ed 1063 (1939).

The knowing and intentional violation of the permanent injunction issued in this case consti-

tutes contempt and no one claims otherwise.[4] All contempt is either direct or indirect *and* either criminal or civil. Contempt is direct if committed in the immediate view and presence of a sitting court, *i.e.,* in cases where all facts necessary to a finding of contempt are within the personal knowledge of the judge. *In re Scott,* 342 Mich 614, 618; 71 NW2d 71 (1955). Direct contempt may be punished summarily, MCL 600.1711(1); MSA 27A.1711(1), and the proceedings are not governed by the Michigan Rules of Evidence, MRE 1101(b)(4). Contempt is indirect when committed beyond the immediate view and presence of the court and cannot be punished summarily but only in accordance with the statute, MCL 600.1711(2); MSA 27A.1711(2), court rule, MCR 3.606 (formerly GCR 1963, 760) and due process, *Cross Co v UAW Local No 155,* 377 Mich 202; 139 NW2d 694 (1966).

In the present case, the violation of the permanent injunction occurred beyond the immediate view and presence of the court and therefore constituted indirect contempt. There is, however, no assertion that the trial court failed in any respect to comply with the applicable procedural requirements.

Appellants do, as noted above, claim that the proceedings were in fact criminal rather than civil. The distinction between civil and criminal contempt relates not to the nature of the misconduct giving rise to the proceedings, but rather to the court's purpose in responding to that misconduct. If the court's purpose is to preserve its authority by punishing past misconduct through the imposition of an unconditional and fixed sen-

---

[4] The appellants' violation of the permanent injunction being undisputed, we need not and do not decide whether appellants' refusal in Docket No. 77964 to promise future compliance could constitute an independent contemptuous act apart from their violation of the permanent injunction.

tence, the proceedings are criminal. If, instead of punishing past misconduct, the court seeks to compel future compliance through the imposition of a sanction of indefinite duration terminable upon compliance or inability to comply, the proceedings are civil.

"Essentially, the difference between civil and criminal contempt is that the former seeks to change respondent's conduct by threatening him with a penalty if he does not change it, while the latter seeks to punish him for past misdoings which affront the dignity of the court. Criminal contempt being for past misconduct, there is no way for one so convicted to purge himself of the contempt." *Jaikins v Jaikins,* 12 Mich App 115, 120; 162 NW2d 325 (1968).

"If [a contempt citation] is to punish the offender for his disobedience or contumacious behavior, then it is criminal contempt. If, however, the purpose is to compel obedience to an order of the court, then it is civil contempt." *Spalter v Wayne Circuit Judge,* 35 Mich App 156, 160-161; 192 NW2d 347 (1971).

In this matter, the contempt proceedings were in both name and fact civil. The trial court's unambiguously expressed purpose was to secure appellants' future compliance with the permanent injunction, not to punish them for their past violation of that injunction.[5] The sanction imposed was a jail sentence of indefinite duration terminable

---

[5] The record of the contempt hearings is replete with statements by the trial judge to the appellants indicating that he was concerned with enforcing the injunction in the future rather than punishing appellants for their past violations. The following colloquy occurred between the court and appellant LaGrou:

"*[The Court]:* Now, my question to you is a very simple one. If you will agree at this point not to again trespass at Williams International in Walled Lake, the Court will let you go. If you won't agree to that, I'm going to sign an Order which requires that you stay in the Oakland County Jail until such time as you agree to purge yourself and agree to conform to the injunction and not go back there.

"Now, which course do you want to take?

"*Mr. LaGrou:* I'm not—quite frankly, your Honor, if I had the

opportunity I would enter that plant and smash those engines because I cannot morally—

"*The Court:* In other words, you feel a moral compunction to do so.

"*Mr. LaGrou:* Yes. So I cannot agree that I will never return to Williams.

"*The Court:* But you understand that that means that you pose a risk to society which society—we're a rule of law unlike the Russians and Nazis and the Chinese and most of the Third World. We live by a rule of law, and we are all bound by that rule of law providing that it's constitutional. This is merely a rule of law which you have offered no defense to and it isn't a criminal proceeding. The only purpose of this injunction is a civil one to permit the United States citizens who are employed at Williams International and the people who own Williams International to continue their pursuit of human freedom, which is guaranteed to them by the Constitution of the United States, and I take it you're unwilling to let them do that?

"*Mr. LaGrou:* Yes.

"*The Court:* Well, under those circumstances, then, I will sign an Order which—if you have nothing further to offer in your defense—

\* \* \*

"All you'd have to do is tell me that you will not again trespass on those premises. I'm not going to get into an argument with you about the morality of anything. My function as a trial judge is a simple one and that is to enforce the laws of the United States and this is one of them. If that—

\* \* \*

"I am going to order that you be incarcerated in the Oakland County Jail until such time as you are willing to purge yourself by agreeing to no longer trespass on the premises of Williams International.

"You may be seated.

"*Mr. LaGrou:* May I ask one question?

"*The Court:* Yes.

"*Mr. LaGrou:* You said until I agree to these terms. In other words, it's an open-ended sentence?

"*The Court:* Yes. If you agree one-half hour from now, I will let you go as a free man.

"*Mr. LaGrou:* But if I don't agree I'll still be in there in a year?

"*The Court:* If you don't agree, as far as I'm concerned you shall stay there until you indicate or there are some facts brought to me which would make it either, one, impossible for you to trespass on Williams International—for example, if they stopped doing business and they're not there, then you would be entitled to immediate release.

"*Mr. LaGrou:* Okay. I just want to get this clarified. So I'm not—I'm being sentenced to an indefinite period?

"*The Court:* That is correct because—

"*Mr. LaGrou:* Until I agree to these terms?

"*The Court: (Continuing)*—it's civil contempt and it's only for the

upon appellant's unilateral expression of a willingness to comply with the permanent injunction in the future. In short, the appellants carried with them the proverbial keys to the jail and at all times had the power to secure their liberty.

Appellants rely upon *People v McCartney*, 132 Mich App 547; 348 NW2d 692 (1984), for the proposition that the "label" affixed to contempt proceedings by a trial court is not determinative and that civil proceedings in name may in fact be criminal. That statement is undoubtedly true, but has nothing to do with this case. In *McCartney*, the trial court purported to provide the appellant an opportunity to purge herself by repayment of converted funds and thus render the contempt proceedings civil rather than criminal. Judge Peterson, sitting by assignment and writing for a unanimous Court, noted that the record established Ms. McCartney's inability to make repayment and concluded that, in the absence of an actual ability to pay, there was no actual opportunity to purge and therefore the proceedings were criminal. In this case, the appellants admittedly

purpose of enforcing the Order. All I'm concerned about is enforcing the injunction. I don't care where you carry on. You can participate in any type of group, riot, crime, anything, anywhere, any place in the United States of America and it doesn't concern me one whit. My function is restricted only to this injunction, this case and Williams International and only as long as Williams International is still a party in interest as far as this injunction is concerned. But as long as they're there under the same circumstances that they are now, and as long as you take the position that the minute you're released you're going out and again attempt to disrupt and trespass and violate the injunction, then as I understand the law you shall remain incarcerated.

"You have the key in your own hands to [the] jailhouse.

"*Mr. LaGrou:* When you say—

"*The Court:* All you have to do is indicate you won't go back there and again trespass and the Court will let you out within 15 minutes."

The court made similar statements to the other appellants, indicating that they could purge themselves and be released by agreeing not to violate the injunction in the future.

had at all times the ability to purge themselves by simply assuring the trial court that they would comply with its lawful injunction in the future. The fact that they were unwilling to do so—perhaps for sincere and noble reasons—did not render the proceedings in this case criminal.

Appellants assert that the trial court could not properly condition their release upon their willingness to promise to abide by the injunction in the future. This claim is without merit. Promised future compliance with prior judicial orders is a common and appropriate method of purging contempt. *State Bar of Michigan v Cramer,* 399 Mich 116; 249 NW2d 1 (1976), and *In re Huff,* 352 Mich 402, 412; 91 NW2d 613 (1958). Since future compliance is the court's objective in civil contempt proceedings, an assurance of such compliance by one deemed worthy of belief is a sensible basis for terminating coercive sanctions.

Appellants' argument based on the law of the case doctrine is without merit. Appellants contend that the present appeals are controlled by this Court's ruling in the two prior appeals, which determined that the previous contempt order issued by the trial court was criminal in nature. Appellants' argument clearly fails. The contempt order which this Court construed in the prior appeals concerned different appellants and was worded differently than the orders involved herein. We hold that the law of the case doctrine has no application to these appeals. We conclude that the contempt orders issued in these cases were civil rather than criminal.

## II

Appellants next contend that the contempt orders impermissibly punished them for exercising

their Fifth Amendment right against self-incrimination. The argument merits little discussion.

US Const, Am V provides in part that no person "shall be compelled in any Criminal Case to be a witness against himself * * *". As we concluded above, however, the contempt proceedings in these cases were civil rather than criminal. Furthermore, the silence to which appellants refer was their refusal to indicate to the court that they would obey the provisions of the injunction in the future. The statements which the appllants refused to make did not involve incriminating matters, since there was nothing incriminating about promising the trial court that they would obey the injunction.[6]

We conclude that the court did not infringe upon appellants' right against self-incrimination.

## III

Appellants finally contend that the contempt orders violated their constitutional right to engage in civil disobedience and their right to privacy.

*Civil disobedience.* Appellants argue that the right to engage in civil disobedience exists by reason of the First Amendment and historical precedent. Appellants assert that, while they may be punished for their acts in violation of the court's order, the trial court's attempt to extract from them a promise to forego their right to engage in a legitimate form of political expression in the future infringes upon First Amendment freedoms. Appellants are unable to cite any au-

---

[6] Appellants do not complain of being coerced into making statements concerning their past violations of the injunction. They only complain that the trial court violated their right to remain silent by attempting to compel them to make statements about future compliance with the injunction.

thority adopting that interpretation of the First Amendment.

An individual's actions are not given absolute protection under the First Amendment. In *Cantwell v Connecticut,* 310 US 296, 303-304; 60 S Ct 900; 84 L Ed 1213 (1940), the Supreme Court stated:

"[T]he [First] Amendment embraces two concepts,— freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." (Footnote omitted.)

Neither the injunction nor the contempt orders require appellants to hold or express any belief nor do they attempt to influence appellants' thoughts. Appellants are free to disagree with any policy of the United States government or any act of Williams International and are free to express their disagreement in any legal fashion. Appellants assert that they have been deprived of an effective means of communicating their beliefs with regard to the manufacture of nuclear weapons; however, the fact that a form of communication may be effective does not mean that it is protected by the First Amendment.[7] Appellants have a number of lawful and effective means of communicating their beliefs, including nontrespassory public demonstrations outside of the plant or in other public locations, printing and distributing leaflets, making speeches, participating in public debates and forums and petitioning Congress to halt the production or deployment of cruise missiles. While appellants' heartfelt desire to halt the

[7] Burning down of the Internal Revenue Service headquarters may be an effective anti-tax statement, but no one would question that the perpetrators would be subject to criminal penalties and that such acts are beyond the protection of the First Amendment.

nuclear arms race is laudatory, appellants simply have no constitutional right to trespass or destroy property in support of their view as to how that noble end should be achieved.

The trial court chose civil contempt as a legitimate means of coercively influencing appellants' future behavior in order to secure compliance with the injunction. We find no infringement upon appellants' First Amendment rights.

*Privacy.* In an argument closely related to their First Amendment claim, appellants attempt to create a constitutional right to privacy which would protect them from having to pledge future compliance with the court's injunctive order. Appellants claim that the trial court improperly forced them to choose between violating their own consciences and going to jail indefinitely, thus intruding upon their innermost sensibilities and beliefs, and invading their right to privacy.

Although the Supreme Court has recognized a right to privacy implicit in the constitution, that right has been formulated in areas which involve the most personal decisions by individuals, namely questions involving marriage, procreation, contraception and other questions related to the family. See *Paul v Davis,* 424 US 693, 712-713; 96 S Ct 1155; 47 L Ed 2d 405 (1976). The questions presented in the case at bar, on the other hand, are inherently public. They are questions which normally are part of that public discourse fundamental in a democratic society. Indeed, civil disobedience is by definition a public act:

"A further point is that civil disobedience is a public act. Not only is it addressed to public principles, it is done in public. It is engaged in openly with fair notice; it is not covert or secretive. One may compare it to public speech, and being a form of address, an expres-

sion of profound and conscientious political conviction it takes place in the public forum." Rawls, *A Theory of Justice* (Cambridge, Belknap Press, 1971) p 366.

Appellants' contention that they are being compelled, under the threat of indefinite imprisonment, to speak contrary to their beliefs is incorrect. The court's contempt orders do not compel appellants to forego their deeply held personal beliefs. Appellants are clearly able to comply with the injunction without relinquishing their belief that the nuclear arms race proposes a grave threat to the future of the human race. Appellants have only been required to refrain from acting on those beliefs in a manner which violates the law of this state.

Appellants are placed in the position of having to decide whether their consciences require them to act upon their beliefs in a way which would violate the court's lawful injunction. They may regain their freedom by assuring the trial court that they will refrain from further acting upon their beliefs in a manner which would violate the court's order. The choice may be difficult, but this does not mean that it invades appellants' right to privacy under the constitution.[8]

---

[8] Appellants quote from Thoreau's "Civil Disobedience" as follows:

"Under a government which imprisons any unjustly, the true place for a just man is also a prison. The proper place to-day, the only place which Massachusetts has provided for her freer and less desponding spirits, is in her prisons, to be put out and locked out of the State by her own act, as they have already put themselves out by their principles."

If this reference is offered as more than obligatory incantation, we find it incongruous that appellants, who profess to be just, should strive so mightily to flee the only place the just should be—jail.

"[Civil disobedience] expresses disobedience to law within the limits of fidelity to law, although it is at the outer edge thereof. The law is broken, but fidelity to law is expressed by the public and nonviolent nature of the act, *by the willingness to accept the legal consequences of one's conduct.* This fidelity to law helps to establish to the majority

We conclude the appellants' conduct in this case is not protected by a constitutional right to privacy.

Affirmed.

---

that the act is indeed politically conscientious and sincere, and that it is intended to address the public's sense of justice." Rawls, *A Theory of Justice,* (Cambridge, Belknap Press, 1971) pp 366-367, emphasis added.

See, also, King, "Letter from Birmingham Jail" in *Why We Can't Wait* (New York, Harper & Row, 1963), pp 77-100, and Kadish & Kadish, *Discretion to Disobey: A Study of Lawful Departures from Legal Rules,* Stanford University Press, 1973, p 158 ["* * * the commonly adduced moral requirement for civil disobedience that the citizen act openly and stand ready to accept any legal punishment appropriate"].