624 N.W.2d 443 (2000)
243 Mich. App. 697
In re CONTEMPT OF AUTO CLUB INSURANCE ASSOCIATION and Norris Goudy.
Hawra Algarawi, a Minor, by her Next Friend, Ali Abdul-Hussein Algarawi, Plaintiff-Appellee,
v.
Auto Club Insurance Association, Defendant-Appellant, and
Norris Goudy, Appellant.
Docket No. 201920.
Court of Appeals of Michigan.
Submitted April 3, 2000, at Detroit.
Decided December 15, 2000, at 9:35 a.m.
Released for Publication February 14, 2001.
*446 Gross, Nemeth & Silverman, P.L.C. (by Steven G. Silverman), Detroit, for Auto Club Insurance Association and Norris Goudy.
Before HOOD, P.J., and GAGE and WHITBECK, JJ. *444
*445 WHITBECK, J.
Appellants Norris Goudy and Auto Club Insurance Association (ACIA) appeal as of right. ACIA challenges the trial court's March 3, 1997, order holding it in contempt of court. Goudy, in-house counsel for ACIA, challenges the trial court's March 5, 1997, order holding him in contempt of court. We reverse.

I. Introduction
As so often occurs in contentious litigation, this appeal arises largely because the lawyers' zest for legal combat overwhelmed their common sense. In the process, a relatively uncomplicated settlement process became a battleground between a stubborn insurer, ACIA, and the equally stubborn attorneys for the claimant, Hawra Algarawi. While the insurer's legal position was legally correct, the bitter legal warfare between the parties ultimately strained the trial court's patience to the breaking point, resulting in contempt orders against the insurer and its attorneys. Ironically, after the trial court entered those contempt orders, the parties apparently negotiated a truce, if not a peace agreement, under which the insurer paid the full amount of the $16,500 settlement to Ali Abdul Hussein Algarawi, Algarawi's father, as her next friend.
With the smoke clearing from this battlefield, we need not address any issues concerning the underlying claim for insurance benefits in this case. Rather, we must confront a series of issues relating to the trial court's contempt orders. In particular, we must determine whether the trial court's contempt orders in this case were for criminal or civil contempt, whether the trial court followed the appropriate procedures to hold ACIA and Goudy in contempt, and whether the sanctions the trial court ordered were proper. Because we ultimately resolve this case on procedural grounds, we need not address whether there was sufficient evidence to prove that Goudy and ACIA committed contempt.
We make one other preliminary note to clarify what could be a confusing element in this case. Although the trial court held Mary T. Nemeth, ACIA's retained attorney, in contempt of court, she does not appeal. Thus, while we recount the circumstances concerning the contempt order against her because those facts are closely connected to the facts that concern Goudy and ACIA, we neither affirm nor reverse the trial court's contempt order against her.

II. Basic Facts And Procedural History
The parties placed a settlement agreement on the record in January 1997. Shortly thereafter, in mid-February 1997, Algarawi filed an emergency motion to show cause. She claimed that ACIA refused to issue a check to her father as her next friend. She also alleged that ACIA was attempting to force her to open a probate estate before it would pay the settlement, even though the payments would be used to pay her medical and legal expenses, leaving none left over for her. Algarawi asked the trial court to issue an order directing ACIA to deliver a check in compliance with the settlement agreement. In response to the motion, ACIA argued that it could pay a sum of this magnitude only if Algarawi, because she was a minor, opened a probate estate. At the hearing on the emergency motion that same day, the trial court asked Goudy to determine whether ACIA would issue the check if Algarawi did not open a probate estate. The trial court concluded the hearing, but did not issue a written order resolving the parties' dispute.
In late February 1997, Algarawi filed a second emergency motion to show cause arguing that, at the earlier hearing, the *447 trial court had ruled that ACIA must issue a check payable to her father and to her attorneys and that ACIA must deliver the check within ten days. Algarawi contended that ACIA refused to deliver the check as ordered and, therefore, requested an order directing ACIA to deliver the check. ACIA countered that Goudy had told the trial court that he would ask ACIA to approve issuing the check andif it agreed to do sohe would have the check within ten days. ACIA also continued to argue that Algarawi had to open a probate estate to receive the settlement, which would ensure that she would not sue ACIA when she reached the age of majority if her father mismanaged or misappropriated the funds.
On February 26, 1997, the trial court held a hearing on Algarawi's second emergency motion to show cause, after which it concluded that Algarawi did not need to open a probate estate in order to receive the settlement money.[1] As a result, the trial court ruled that ACIA had to give the settlement money to Algarawi by hand-delivering a check to her attorneys' offices by noon on February 28, 1997. The trial court did not issue a written order to this effect.
According to ACIA, on February 28, 1997, Nemeth, ACIA's retained attorney, appeared at Algarawi's attorneys' offices where she presented a $5,000 check. Nemeth attempted to explain to Algarawi's attorneys that it would be illegal for ACIA to pay more than $5,000 directly to Algarawi's father. When Algarawi's attorneys refused to accept the $5,000 check, instead demanding a check in the full amount of $16,500, ACIA moved to compel Algarawi's attorneys to accept $5,000 in partial satisfaction of the settlement.
Also on February 28, 1997, ACIA filed a motion to modify the trial court's oral ruling on the second emergency motion, arguing that it had attempted to comply with the ruling to the fullest extent possible without violating the law by offering the $5,000 check to Algarawi's attorneys. ACIA argued that only a conservator appointed to administer a probate estate for Algarawi could accept the remaining $11,500. ACIA asked the trial court to direct Algarawi's attorneys to commence appropriate probate proceedings to open an estate so that a court could appoint a conservator for her and so it could finally pay the remaining $11,500. ACIA also asked the trial court to enter an order granting its motion because Algarawi's attorneys had refused to approve a proposed order concerning this $5,000 partial payment.
On the same day, however, Algarawi moved to hold Goudy in contempt of court. She argued that, at the hearing on the first emergency motion, the trial court had ordered Goudy to deliver a check for $16,500, Goudy had violated this order, the trial court had granted Algarawi's second emergency motion, and Nemeth had attempted to persuade Algarawi's attorneys to accept a $5,000 check, violating the trial court's second ruling. Algarawi therefore contended that the trial court should hold Goudy in contempt and sanction him until ACIA delivered a check for $16,500.
On March 3, 1997, the trial court held a hearing on Algarawi's motion to hold Goudy in contempt. Nemeth argued that the trial court should grant ACIA's motion to modify the trial court's previous ruling that Algarawi did not need to open a probate estate and to allow ACIA to pay only $5,000 to Algarawi's father as her next friend. Then, Nemeth argued, ACIA could appeal the trial court's ruling. As the following transcript excerpts reveal, the trial court made it well-known to everyone *448 present at the hearing that it was not impressed with ACIA's argument.

The Court:... Okay. I've heard the law. I read the case law. I read it last time. Now you're in contempt. Who wants to go to jail?

Ms. Nemeth [defense counsel]: Your Honor, I'm the one.

The Court: Okay. What's your name, ma'am?

Ms. Nemeth: My name is Mary Nemeth. I'm the appellate attorney. I was retained last Wednesday after the show cause hearing to look at this case, to review it for a possible appeal. I am convinced that because this is over $5,000.00 you have to have a conservator.

* * *

The Court:... The Court's going to grant your motion to hold them in contempt. The Court's going to simply sanction my [sic] appellate lawyer [Nemeth]. The Court's going to deny the motion to compel Plaintiff's attorney to accept five thousand. The Court's going to enter an order granting Plaintiff's motion to show cause....

* * *

The Court:... What's the name of your client that wont [sic] write the check?

Ms. Nemeth: The name of my client?

The Court: That wont [sic] write the check. Who's your client? Who are you dealing with at AAA?

Ms. Burbott [plaintiffs' counsel]: Mr. Goudy.

The Court: Mr. Goudy? You work for AAA, sir?

Mr. Goudy [defense counsel]: Yes, ma'am, I do.

The Court: Okay. You're in house?

Ms. Nemeth: He is not authorized to write those checks.

Ms. Burbott: He's authorized to order them.

Ms. Nemeth: That's true.

* * *

The Court: Sir, [to Goudy] I'm speaking. I've ruled twice. This is the third time. My head hurts. Banging my head against the wall with you guys. The Court reads the law. I make interpretations. You have the right to appeal. I'm telling you, appeal it as a final judgment after you pay the money. You don't want to listen to my rulings, you want to be held in contempt of court, counsel's going to pay $500.00 to First Step, you're going to go up to lockup, sir, until we get sixteen-five for this minor. I don't know how else to get it through your head. This is my ruling. This is the third time I've ruled this way.

* * *

Ms. Nemeth: Is this going to beif I get the check made out this way, is this proper?

Ms. Burbott: It should be exactly as the release. Hawra Algarawi, a Minor, by her Next Friend Ali Abdul

Ms. Nemeth: Okay. We just have to reverse that. Okay.

The Court: When are you going to do that, counsel?

Ms. Nemeth: By the end of the week.

The Court: How about by five o'clock?

Ms. Nemeth: Your Honor, I can't physically get a check, I believe.

The Court: I don't want to keep him overnight.

Ms. Nemeth: I don't want to see him overnight.

The Court: What do I want to put him overnight at the County Jail?

Ms. Nemeth: If it's five o'clock, I will try to do the absolutely best that I can to try to get this issued.

The Court: Mr. Goudy, I'm sorry. You'll have to go up to lockup until she gets

Mr. Goudy: I'm sorry, too, Judge. Might I say one thing, Judge?

*449 Ms. Nemeth: Your Honor, may I make a phone call and see how quickly I can get this?

Mr. Goudy: Might I say one thing on this record?

The Court: Be my guest, sir. You seem to want to say a lot of things.

Mr. Goudy:... Now this Court is relating to me as though I have somehow been in contempt of this Court or used some abusive language or failed to comply with the Court's order.

The Court: Twice. Twice. Twice.

Ms. Nemeth: Your Honor

Mr. Goudy: Judge, what I did was went back to my client

The Court: Good bye.

The Bailiff: This way.

Ms. Nemeth: Your Honor, will you stay enforcement until I at least make a phone call to see how quickly I can get this check?

The Court: Yeah. Why don't you.

Ms. Nemeth: Let me make a phone call, see what I can do.
The record does not make clear whether Goudy ever went to jail. In its appellate brief, ACIA states that Goudy was "released from custody by the trial court" later in the day and, during oral argument to this Court, ACIA's counsel stated that Goudy was "detained but then released." It is, however, plain that on March 3, 1997, the trial court entered a written order holding "counsel for ACIA" in contempt of court without specifying whether the contempt was civil or criminal. This order required ACIA's counsel, presumably Nemeth,[2] to pay $500 to First Step, which is apparently a charitable organization. The trial court also entered a second written order denying an oral motion by ACIA to stay execution of sentence in which the trial court stated that it had "adjudicated ACIA to be in contempt of this Court." This second order did not specify the nature of the contempt, i.e., civil or criminal, and it did not require ACIA to pay a fine or impose any other sanction on ACIA.[3]
On March 5, 1997, the trial court entered a written order granting Algarawi's motion to hold Goudy in contempt, again without specifying whether this contempt was civil or criminal. The order explained that the trial court was holding Goudy in contempt because it had "directed Defense counsel at a prior hearing on February 26, 1997, to deliver to Plaintiffs' counsel no later than Friday, February 28, 1997, at 12:00 noon a settlement draft in the amount of $16,500.00 made payable" to Algarawi, her father as her next friend, and her attorneys. However, the order proceeded to note, "Defendant, in concert with Defense counsel, willfully disregarded this Court's order to so deliver the check...." As a result, the trial court ordered "Defendant's counsel," clearly Goudy given that his name appeared in the title of the motion, to "pay sanctions in the amount of $500" to First Step.
According to ACIA's brief, on the same day Algarawi obtained letters of authority from the Wayne County Probate Court appointing her father conservator of her estate, ACIA hand-delivered a check in the amount of $16,500 to Algarawi's attorneys' offices. The check was payable jointly to *450 Algarawi's father, as conservator, and Algarawi's attorneys.
In sum, the trial court exercised its contempt powers three ways in this case. First, it held Nemeth in contempt during the hearing on March 3, 1997, and ordered her to pay $500 to First Step as a sanction. The trial court confirmed this order in writing that same day. Second, the trial court held Goudy, as counsel for ACIA, in contempt during the hearing on March 3, 1997, and detained him for some time. The trial court confirmed this contempt holding in a written order dated March 5, 1997, which also compelled Goudy to pay $500 to First Step. Both of these written orders included a typed reference to "criminal contempt" that has been crossed out by hand. Third, in a March 3, 1997, order denying ACIA's motion to stay execution of the contempt ruling against Goudy, the trial court, perhaps inadvertently, noted that it had held ACIA in contempt, again without specifying whether the contempt was civil or criminal.

III. Contempt Power: The Queen Of Battle
If the artillery is the queen of battle, then the power to punish contempt is its functional equivalent in the stylized combat of modern litigation. The power to hold a party, attorney, or other person in contempt is the ultimate sanction the trial court has within its arsenal, allowing it to punish past transgressions, compel future adherence to the rules of engagement, i.e., the court rules and court orders, or compensate the complainant.[4] In In re Contempt of Robertson,[5] we defined contempt of court as a "willful act, omission, or statement that tends to ... impede the functioning of a court." Indeed, the primary purpose of the contempt power is to preserve the effectiveness and sustain the power of the courts.[6] Because the power to hold a party in contempt is so great, it "carries with it the equally great responsibility to apply it judiciously and only when the contempt is clearly and unequivocally shown."[7]
Interestingly enough, a court's authority in this area does not originally come from an external source, such as a statute. Rather, the power to hold a party in contempt is inherent in the judiciary as generally established in Const. 1963, art. 6, § 1. As the Supreme Court commented in In re Huff:[8]
There is inherent power in the courts, to the full extent that it existed in the courts of England at the common law, independent of, as well as by reason of statute, which is merely declaratory and in affirmation thereof, to adjudge and punish for contempt.... Such inherent power extends not only to contempt committed in the presence of the court, but also to constructive contempt arising from refusal of defendant to comply with an order of the court. Such power, being inherent and a part of the judicial power of constitutional courts, cannot be limited or taken away by act of the legislature nor is it dependent on legislative provision for its validity or procedures to effectuate it.
Still, the Legislature has reinforced this inherent power by enacting a number of statutes that permit the courts to punish *451 contempt.[9] MCL 600.1701; MSA 27A.1701, the general contempt statute, is particularly relevant in this case. It permits "[t]he supreme court, circuit courts, and all other courts of record ... to punish by fine or imprisonment, or both, persons guilty of any neglect or violation of duty or misconduct" in enumerated circumstances.[10] Those persons and circumstances include:
(c) All attorneys ... and all other persons in any manner duly elected or appointed to perform any judicial or ministerial services, for any misbehavior in their office or trust, or for any willful neglect or violation of duty, for disobedience of any process of the court, or any lawful order of the court, or any lawful order of a judge of the court or of any officer authorized to perform the duties of the judge.

* * *
(g) Parties to actions, attorneys, counselors, and all other persons for disobeying any lawful order, decree, or process of the court.[[11]]
Thus, there is no question that the trial court in this case had the power to hold ACIA, Goudy, and Nemeth in contempt if they committed a "willful act, omission, or statement" that tended to interfere with the way the trial court was handling this case. However, the sanction the trial court imposed to punish this contemptuous conduct was limited by M.C.L. § 600.1715; MSA 27A.1715, which provides:
(1) Except as otherwise provided by law, punishment for contempt may be a fine of not more than $250.00, or imprisonment which, except in those cases where the commitment is for the omission to perform an act or duty which is still within the power of the person to perform shall not exceed 30 days, or both, in the discretion of the court.

(2) If the contempt consists of the omission to perform some act or duty which is still within the power of the person to perform, the imprisonment shall be terminated when the person performs the act or duty or no longer has the power to perform the act or duty which shall be specified in the order of commitment and pays the fine, costs, and expenses of the proceedings which shall be specified in the order of commitment.[[12]]
Accordingly, we must examine whether the sanctions imposed in this case were legally correct even if the decisions to hold ACIA and Goudy in contempt were proper.

IV. Civil And Criminal Contempt: Different Weapons

A. Overview
The power to punish contempt means little in the abstract. How a court uses this power is much more important and depends largely on the nature of the problem the court is attempting to cure or prevent. As in the real world, different problems in courts often call for different weapons. Accordingly, courts have two different forms of the contempt power at their disposal. The court's purpose in exercising its contempt powers, to coerce or to punish, not the nature of the contemptuous conduct, defines which of the two contempt powers the court actually uses.[13] Further, to draw once again on the warfare analogy, each of these weapons must be loaded or armed in a certain manner before they can be discharged. In other words, the trial court must carry out the *452 proper procedures before it can issue the order holding an individual or party in contempt of court in order to carry out its goal of coercing particular action or punishing a misdeed.

B. Civil Contempt: Coercion
When a court seeks to compel a contemnor to comply with its order requiring or forbidding some particular act, the court may use the coercive sanctions permitted by civil contempt, including a fine of up to $250, a jail term of no more than thirty days that expires when the contemnor purges the contempt, and compensation to others who sustain losses because of the contemptuous conduct.[14] Civil contempt ends when the contemnor complies with the court's order or is no longer able to do so and pays any fines or costs for the contempt proceedings.[15] This ability to cure contempt, essentially making other sanctions unnecessary, is why the contemptuous behavior must persist at the time of the contempt hearing in order for the trial court to impose a coercive sanction.[16]
This contempt hearing is, however, an interesting study in and of itself. When exercising its civil contempt power, the court acts as the factfinder, determines whether there was contempt under a preponderance of the evidence standard,[17] and imposes sanctions if this standard is met.[18] If the contemptuous behavior occurs in front of the court, i.e., it is "direct" contempt, there is no need for a separate hearing before the court imposes any proper sanctions because "all facts necessary to a finding of contempt are within the personal knowledge of the judge."[19] If the contemptuous conduct occurs outside the court's direct view, i.e., it is "indirect" contempt, the court must hold a hearing to determine whether the alleged contemnor actually committed contempt.[20] This hearing must follow the procedures established in MCR 3.606 and afford some measure of due process before the court can determine whether there is sufficient evidence of contempt to warrant sanctions.[21]

C. Criminal Contempt: Punishment
Criminal contempt, which may also be classified as direct or indirect, serves a very different purpose from civil contempt in that it punishes the contemnor for past conduct that affronts the court's dignity.[22] A court exercising its criminal contempt power is not attempting to force the contemnor to comply with an order.[23] Therefore, it is impossible to purge this sort of contempt by acting in any particular manner.[24]
*453 Although criminal contempt is really only a "quasi-crime,"[25] criminal contempt proceedings encompass many of the same due process safeguards available to defendants charged with traditional crimes. For instance, an alleged criminal contemnor is presumed innocent and is protected from compelled self-incrimination.[26] The alleged contemnor must be allowed to offer a defense to the contempt charge, as well as adequate time in which to prepare the defense.[27] Further, an alleged contemnor's "willful disregard or disobedience" of a court order and a clearly contemptuous act must be proved beyond a reasonable doubt.[28] Like civil contempt, direct criminal contempt may be tried summarily, but indirect criminal contempt is subject to the specific procedures outlined in MCR 3.606.[29] If a court finds that there was contempt, it may impose a fine of up to $250, a jail term of up to thirty days, or both.[30] The court may also require a criminal contemnor to pay compensation for damages caused by the contemptuous conduct.[31]

V. The Contemptuous Conduct

A. Standard Of Review
We review for abuse of discretion a trial court's decision to hold a party or individual in contempt.[32] However, to the extent that our review in this case requires us to examine questions of law, such as the nature of the contempt orders and whether the contempt statute permitted the sanctions imposed in this case, review is de novo.[33]

B. The Form of the Contempt
With these distinctions between civil and criminal contempt in mind, it is clear that the trial court intended to hold ACIA and Goudy in criminal, not civil contempt. The trial court's contempt orders evinced an intent to punish ACIA and Goudy for their past misconduct in violating the trial court's orders compelling them to tender the $16,500 check to Algarawi's father and lawyers. The trial court's statements on the records similarly showed an intent to punish ACIA and Goudy for actions and arguments that the trial court plainly found frustrating and obstructive.
Algarawi's motion to show cause plainly asked the trial court to find that Goudy committed civil contempt in that it asked the trial court to impose coercive sanctions until ACIA tendered the check. Yet, the trial court's contempt orders did not condition payment to First Step on any corrective action ACIA or Goudy might take in the future. The only minor evidence that the trial court ever intended to coerce anyone into complying with its order to pay $16,500 to Algarawi's father and attorneys was its decision to detain Goudy. However, we conclude that the contempt orders against Goudy and ACIA at issue in this appeal lack even the minimal coercive elements surrounding Goudy's brief detention, which was not included or described *454 in either of these orders.[34] With no way to purge the contempt, the trial court's orders had to be noncoercive, criminal contempt orders, designed to punish the contemnors. That the trial court crossed out the word "criminal" on the March 3, 1997, order against Goudy is irrelevant to this true classification.[35]

C. The Procedure
At this point in the analysis, we are not terribly concerned that the trial court failed to assign the appropriate description to its criminal contempt orders or whether ACIA and Goudy actually committed contempt. Rather, our primary concern is the way the trial court followed, or did not follow, the procedures necessary to hold ACIA and Goudy in criminal contempt for their conduct.
The contempt proceeding in this case was instituted by a show cause motion, which was scheduled for hearing on the trial court's civil docket. Even though he had a right to know the nature of the contempt charge against him,[36] Goudy was not informed of whether he was being accused of criminal or civil contempt either in the written motion or at the hearing. Moreover, even though there are many procedures that exist to protect an alleged contemnor and to guarantee that his contemptuous conduct is proved beyond a reasonable doubt, the hearing in this case did not incorporate any of these safeguards. When presented with similar circumstances in People v. Nowicki,[37] the Michigan Supreme Court reversed the contempt finding and vacated the contemnor's sentence.[38] We conclude that Goudy is entitled to just such a result in this case with the exception that, at Goudy's request, we do not require First Step to return the $500 to him.[39]
The contempt order against ACIA is even more difficult to justify because of the procedures the trial court used. Algarawi's motion to show cause instituting this contempt proceeding pertained only to Goudy, not ACIA. Not only was ACIA denied its right to know the substance of the charges against it, it was not informed that it was being charged with contempt at all from this motion. The contempt hearing also failed to give ACIA notice that it was being charged with contempt because the trial court's order appeared to concern ACIA's attorneys as individuals.[40] The first time it became clear that the trial court intended to hold ACIA in contempt was in the March 3, 1997, order, after the trial court had already done so. This completely denied ACIA an opportunity to prepare or present a defense.[41]
Further, this was the most summary of all summary procedures because *455 the show cause hearing on the contempt issue did not involve any contempt charges against ACIA and there was no other hearing on the matter. Yet, as we noted above, summary procedures are only permissible in cases where there is direct contempt, i.e., contempt committed in front of the court.[42] In this case, however, the allegedly contemptuous conduct was ACIA's failure to issue and deliver a check for $16,500 to opposing counsel's offices by a deadline. Because this failure to act did not occur in the trial court's presence, the trial court could not use a summary procedure.[43] We therefore reverse the trial court's criminal contempt finding against ACIA not only because it was denied the notice and other procedural safeguards to which it was entitled, but also because the trial court improperly used a summary proceeding to hold it in contempt.[44]

D. The Amount Of The Sanctions
Even if we were not inclined to reverse the contempt orders against Goudy and ACIA on procedural grounds in this case, the $500 sanctions the trial court ordered Goudy to pay to First Step would require us to take corrective action. As ACIA and Goudy argue,[45] $250 is the maximum fine permitted under M.C.L. § 600.1715(1); MSA 27A.1715(1), which we set out in section III, above. The statute is unambiguous. It does not grant a court the discretion to impose a monetary fine that exceeds $250 for a single act of contempt.[46] A court may order the contemnor to pay compensation for actual loss or injury due to the contemptuous conduct even if that amount exceeds the $250 threshold.[47] Nevertheless, the $500 fine Goudy paid in this case was not intended to be compensation. Had it been intended as compensation, then the trial court would have likely ordered Goudy to pay the $500 to Algarawi, assuming that that amount accurately reflected damages she sustained.[48] Accordingly, the trial court could not order Goudy to pay $500 to First Step, which was twice the amount allowed under the statute. This was, without a doubt, a legally invalid amount to order as a fine. If Goudy had asked to be repaid this amount, we would have granted him that relief.

E. The Payment To A Charity
ACIA and Goudy also argue that the trial court exceeded its authority by requiring Goudy to pay this $500 fine to First Step, a charity. Const 1963, art 6, § 7 provides:
The supreme court may appoint, may remove, and shall have general supervision of its staff. It shall have control of the preparation of its budget recommendations and the expenditure of moneys appropriated for any purpose pertaining to the operation of the court or the performance of activities of its staff except that the salaries of the justices shall be established by law. All fees and perquisites[[49]] collected by the court staff *456 shall be turned over to the state treasury and credited to the general fund.[[50]]
This constitutional provision requires the Michigan Supreme Court to remit all the money that it collects to the state treasury. Because Michigan has only "one court of justice,"[51] of which the trial court in this case is a part, the trial court had an obligation to follow Const. 1963, art. 6, § 7. Stated another way, like the Supreme Court, the trial court in this case was required to remit any money it collected to the state treasury. The trial court lacked the discretion to designate a beneficiary for the fine it imposed on Goudy, even if the beneficiary was particularly worthy.[52]
Because there are circumstances in which a circuit court may spend public money to support necessary services for the judiciary,[53] we must consider whether the trial court in this case had the authority to direct Goudy to pay the fine to First Step as if he was making the payment to the charity on behalf of the Third Judicial Circuit Court. However, this case involves a decision to direct private money to what appears to be a private recipient that is completely distinct from the judiciary. In other words, because the money went directly from Goudy to First Step, not from Goudy to the trial court, the money never became public, even if it was perhaps owed to the public through the return process mentioned in Const. 1963, art. 6, § 7. Nor is it at all clear whether First Step offered any services to the judiciary, much less necessary services. Further, even if we could consider the $500 Goudy paid to First Step public money and could conclude that First Step offered necessary services to the judiciary, the trial court in this case lacked the Supreme Court's approval to take this action.[54] Thus, there is no way to characterize the trial court's decision to order Goudy to pay $500, or any other amount, to First Step as proper.

VI. Conclusion
Like other courts that have grappled with difficult cases involving contempt, throughout this opinion we have used the battlefield metaphor to illustrate our view of the facts.[55] We emphasize, however, that litigation is not warfare under another name. Rather it is, and must remain, a civilif not always amicablealternative to outright combat. This case speaks volumes about the untoward consequences of senseless legal conflict and presents us with an opportunity to make bad law, as bad facts are prone to encourage. By reversing the trial court's contempt order concerning ACIA and Goudy, we believe we have avoided making a bad situation worse. At a minimumand in the most basic sensethis is our obligation as a reviewing court.
Reversed.
NOTES
[1] On appeal, Goudy and ACIA insist that Algarawi had to open a probate estate to receive a settlement of this size. If we were forced to decide this issueand we are notwe would be inclined to agree that the plain language of MCR 2.420(4)(a) required her to open a probate estate. See, generally, Smith v. YMCA of Benton Harbor/St. Joseph, 216 Mich.App. 552, 556, 550 N.W.2d 262 (1996); see also M.C.L. § 700.403; MSA 27.5403.
[2] The transcripts suggest that the trial court was referring to Nemeth when it mentioned "counsel for ACIA" in its order. For instance, after referring to Nemeth as a "hoot" and observing it had "never seen anyone take me up on appeal over such piddly baloney material when I know I'm right," the trial court stated to Nemeth:

I'll tell you what, I'm not going to send you to jail. I'm going to sanction you for five hundred bucks. You're going to write a check to First Step. Sorry. I'm sure your client would like that money, counsel, but [F]irst [S]tep needs it more.
Nemeth confirmed that the trial court was speaking to her because she asked the court how to draft a check for the contempt fine.
[3] Both orders entered on March 3, 1997, originally referred to criminal contempt. However, the word "criminal" was stricken from both orders, leaving no classification for the contempt.
[4] In re Contempt of United Stationers Supply Co., 239 Mich.App. 496, 499, 608 N.W.2d 105 (2000).
[5] In re Contempt of Robertson, 209 Mich.App. 433, 436, 531 N.W.2d 763 (1995), citing Pontiac v. Grimaldi, 153 Mich.App. 212, 215, 395 N.W.2d 47 (1986).
[6] People v. Kurz, 35 Mich.App. 643, 656, 192 N.W.2d 594 (1971).
[7] People v. Matish, 384 Mich. 568, 572, 184 N.W.2d 915 (1971).
[8] In re Huff, 352 Mich. 402, 415-416, 91 N.W.2d 613 (1958) (citations omitted); see also In re Contempt of Dougherty, 429 Mich. 81, 91, n. 14, 413 N.W.2d 392 (1987) (Dougherty II).
[9] See, e.g., M.C.L. § 600.1346; MSA 27A.1346 (jurors); MCL 600.2164; MSA 27A.2164 (excessive expert witness fees); MCL 600.3820; MSA 27A.3820 (public nuisance); MCL 600.8713; MSA 27A.8713 (false statements by authorized local officials).
[10] MCL 600.1701; MSA 27A.1701.
[11] Emphasis added.
[12] Emphasis added.
[13] See State Bar v. Cramer, 399 Mich. 116, 127-128, 249 N.W.2d 1 (1976); see also Gompers v. Bucks Stove & Range Co, 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911).
[14] MCL 600.1715; MSA 27A.1715, M.C.L. § 600.1721; MSA 27A. 1721; see also Dougherty II, supra at 98, 413 N.W.2d 392.
[15] MCL 600.1715(2); MSA 27A. 1715(2); see In re Contempt of Calcutt, 184 Mich.App. 749, 758, 458 N.W.2d 919 (1990).
[16] Dougherty II, supra at 111, 413 N.W.2d 392.
[17] Jaikins v. Jaikins, 12 Mich.App. 115, 121, 162 N.W.2d 325 (1968).
[18] Calcutt, supra.
[19] Williams Int'l Corp. v. Smith, 144 Mich.App. 257, 262, 375 N.W.2d 408 (1985) (Dougherty I). rev'd on other grounds by Dougherty II, supra; see also M.C.L. § 600.1711(1); MSA 27A.1711(1) (permitting summary proceedings for direct contempt).
[20] Dougherty I, supra at 262, 375 N.W.2d 408; see also M.C.L. § 600.1711(2); MSA 27A. 1711(2) (permitting punishment for indirect contempt after requiring "after proof of the facts charged and opportunity has been given to defend," meaning that there has been some sort of hearing).
[21] Dougherty I, supra at 262, 375 N.W.2d 408, citing Cross Co. v. UAW Local No. 155, 377 Mich. 202, 139 N.W.2d 694 (1966).
[22] Cramer, supra at 127, 249 N.W.2d 1, quoting Jaikins, supra at 120, 162 N.W.2d 325.
[23] In re Contempt of Rochlin, 186 Mich.App. 639, 645, 465 N.W.2d 388 (1990).
[24] Cramer, supra at 127, 249 N.W.2d 1.
[25] Dougherty II, supra at 90-91, 413 N.W.2d 392.
[26] Jaikins, supra at 121, 162 N.W.2d 325, quoting Gompers, supra at 444, 31 S.Ct. 492.
[27] Robertson, supra at 438, 531 N.W.2d 763.
[28] In re Contempt of O'Neil, 154 Mich.App. 245, 248, 397 N.W.2d 191 (1986) (citations omitted).
[29] In re Contempt of Barnett, 233 Mich.App. 188, 192-193, 592 N.W.2d 431 (1998).
[30] MCL 600.1715(1); MSA 27A.1715(1).
[31] MCL 600.1721; MSA 27A.1721.
[32] United Stationers, supra at 499, 608 N.W.2d 105.
[33] See, generally, Oakland Co. Bd. of Co. Rd. Comm'rs v. Michigan Property & Casualty Guaranty Ass'n, 456 Mich. 590, 610, 575 N.W.2d 751 (1998) (questions of statutory construction require review de novo); Cramer, supra at 128, 249 N.W.2d 1 (because a trial court's characterization does not determine the nature of a contempt order, review does not entail extending deference to the trial court; this is essentially review de novo).
[34] We note that even though the trial court held ACIA in contempt of court, it did not impose sanctions of any kind directly on the insurer. This strongly supports the idea that there was no coercive motivation behind that order.
[35] Cramer, supra at 128, 249 N.W.2d 1.
[36] Robertson, supra at 438, 531 N.W.2d 763.
[37] People v. Nowicki, 384 Mich. 482, 485, 185 N.W.2d 390 (1971).
[38] Id. at 485-486, 185 N.W.2d 390, quoting People v. Johns, 384 Mich. 325, 183 N.W.2d 216 (1971).
[39] See, generally, CBS, Inc. v. Pennsylvania Record Outlet, Inc., 598 F.Supp. 1549, 1559 (W.D.Pa., 1984).
[40] There is one place in the transcript where the trial court asked who was representing ACIA at the hearing. Nemeth replied that she was representing ACIA that day. Although the trial court eventually held her in contempt, the transcript as a whole suggests that the trial court did so because it was reacting to her continuing arguments against payment, not simply because she was ACIA's representative. There was no explicit statement on the record that the trial court was charging ACIA with contempt. Therefore, we have no reason to believe that any of the trial court's comments at the hearing constituted notice to ACIA that it was charged with contempt.
[41] Robertson, supra at 438, 531 N.W.2d 763.
[42] Dougherty I, supra at 262, 375 N.W.2d 408.
[43] See Barnett, supra at 192-193, 592 N.W.2d 431.
[44] If Nemeth had appealed the contempt order entered against her, we would reach the same result based on the same reasoning we applied to the circumstances surrounding ACIA's contempt.
[45] None of the contempt orders required ACIA to pay money as a sanction and Nemeth does not appeal. Therefore, our conclusion on this issue and the next one only affect the order against Goudy.
[46] In re Contempt of McRipley, 204 Mich.App. 298, 301-302, 514 N.W.2d 219 (1994); In re Contempt of Johnson, 165 Mich.App. 422, 428-429, 419 N.W.2d 419 (1988).
[47] MCL 600.1721; MSA 27A. 1721.
[48] See Consolidated Rail Corp. v. Yashinsky, 170 F.3d 591, 596 (C.A.6, 1999).
[49] A "perquisite" is an incidental payment, benefit, or privilege over and above regular income or salary as well as "something demanded or due as a particular privilege." Random House Webster's College Dictionary (2d ed.). A "fine" as it is used in this contempt context fits within the meaning of a perquisite because it is income to the trial court above and beyond the money allocated in the annual budget.
[50] Emphasis added.
[51] Const. 1963, art. 6, § 1; Wayne Circuit Judges v. Wayne Co., 383 Mich. 10, 20, 172 N.W.2d 436 (1969), mod. on reh. on other grounds 386 Mich. 1, 190 N.W.2d 228 (1971).
[52] See also Town of Manchester v. Dep't of Environmental Quality Engineering, 381 Mass. 208, 210-211, 216-219, 409 N.E.2d 176 (1980) (trial court could not order the defendant to pay a $30,000 contempt fine to community organization or political subdivision to improve the environment because the state constitution provided that "[a]ll money received on account of the commonwealth from any source whatsoever shall be paid into the treasury thereof").
[53] Wayne Circuit Judges, supra at 22-23, 172 N.W.2d 436.
[54] Wayne Circuit Judges (On Rehearing), supra at 9, 190 N.W.2d 228.
[55] See Cross, supra.